IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| AARON HANSEN, ET AL | § | CASE NO. 2:13-CV-00242 |
| | § | CORPUS CHRISTI, TEXAS |
| VERSUS | § | MONDAY, |
| | § | MARCH 17, 2014 |
| TOTAL SCREEN SOLUTIONS, INC., | § | |
| ET AL | § | 9:00 A.M. TO 10:09 A.M. |


<u>STATUS CONFERENCE</u>


BEFORE THE HONORABLE NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE Plaintiff:                    SEE NEXT PAGE

FOR THE Defendant:                    SEE NEXT PAGE

COURT CLERK:                          BRANDY CORTEZ

COURT RECORDER:                       GENAY ROGAN




TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:


FOR THE PlaintiffS:                   DAVID MOULTON, ESQ.
                                      Bruckner Burch, PLLC
                                      8 Greenway Plaza, Suite 1500
                                      Houston, Texas 77046


FOR THE DefendantS:                   ANNETTE A. IDALSKI, ESQ.
                                      Chamberlain Hrdlicka, et al.
                                      191 Peachtree St., NE, 34th Fl.
                                      Atlanta, Georgia 30303

                                      DANIEL DOUGLAS PIPITONE, ESQ.
                                      Chamberlain Hrdlicka, et al.
                                      1200 Smith Street, 14th Floor
                                      Houston, Texas 77002

<u>HOUSTON, TEXAS; MONDAY, MARCH 17, 2014; 9:00 A.M.</u>

THE COURT:  The Court calls Cause Number C-13-242, Hansen, et al versus Total Screen Solutions, Inc., et al.  If the Plaintiff will announce?

MR. MOULTON:  David Moulton for the Plaintiffs.

MR. PIPITONE:  Your Honor, I'm Dan Pipitone, and my partner, Annette Idalski, for the Defendants.

THE COURT:  All right.  We're here on several matters, and I guess first was Mr. Hansen found?

MR. MOULTON:  Your Honor, I received an email from him a couple of weeks ago.  He indicated that he is working out of the country and won't be back until September.  He said -- he requested that I -- we've taken on the case.  He didn't say anything more.  I tried to get more information out of him and he didn't respond.

THE COURT:  Okay.  So you're going to dismiss him?

MR. MOULTON:  Right.  We were proposing dismissal -- we discussed it with the defense, we're proposing dismissal without prejudice.  They didn't agree to the without prejudice part.

MR. PIPITONE:  And that's correct, Your Honor.  I think at this stage with Mr. Hansen not being a participant ever since he initiated the suit.  He really hasn't been active at all, and at this point I think that we would like to have it with prejudice.  To make it without prejudice merely

1    gives him another extension of the time he's already received

2    to participate.

3            THE COURT:  The Court is going to grant the

4    dismissal without prejudice, but then that does affect -- he's

5    the lead -- well, you have two, you have Lauterbach also.

6            MR. PIPITONE:  Yes, Your Honor.

7            THE COURT:  Well, we'll get to that in a minute on

8    the certification.  But --

9            MR. PIPITONE:  Your Honor --

10           THE COURT:  Go ahead.

11           MR. PIPITONE:   -- if I might, please --

12           THE COURT:  Yes.

13           MR. PIPITONE:   -- we have a case out of the Middle

14   District -- excuse me, out of the District of Maryland.  It's

15   an unpublished opinion with facts that are very similar to

16   this.

17           THE COURT:  Like where one of the main Plaintiffs is

18   dismissed, or what --

19           MR. PIPITONE:  Where the Plaintiff -- no, it's not a

20   collective action, but it is an employment related matter.

21   And in that case, very similar circumstances to this, the

22   Plaintiff indicated that she did not want to participate, she

23   was "stressed out", and the Plaintiff's attorney tried to

24   dismiss it without prejudice and the Court dismissed it with

25   prejudice.

1          And I have a copy of that case for Your Honor's

2     consideration, but that's why we're pressing for the dismissal

3     with prejudice, based on *Hood* case out of the District of

4     Maryland.

5          THE COURT:  I'll look at it and if I think I need to

6     reconsider, I will, but --

7          Have you had a chance to look at that case?

8          MR. MOULTON:  No, Your Honor.

9          MR. PIPITONE:  No, we haven't.

10         THE COURT:  Either way.

11         MR. MOULTON:  Whichever order.

12         MR. PIPITONE:  If I may pass this up, Your Honor?

13         THE COURT:  Yes.  So I mean what was the situation

14     here, were they pretty far along into the case or?

15         MR. PIPITONE:  They were along into the case, Your

16     Honor.  The Plaintiff had initiated a suit, but had not

17     participated in discovery.  There has been a motion to compel

18     discovery just as we had here, Your Honor.  And then at that

19     point the Plaintiff's attorney received a communication from

20     the Plaintiff to the effect that she was overly stressed about

21     the lawsuit and did not want to participate.

22         The lawyer asked -- but she did not state whether

23     she wanted it with or without prejudice, she's a layperson,

24     probably didn't know the difference.  Similarly with

25     Mr. Hansen here probably doesn't know the difference either.

1    But in that case the attorney for the Plaintiff, Ms. Hood,

2    asked for a dismissal without prejudice and the Court said,

3    No, we've gone along actively for some times now, the

4    Defendant has been very involved, has spent exorbitant sums of

5    money in the defense, such as we have here.

6         THE COURT:  But you're going to -- we're -- this

7    action's going to continue, right, anyway, I guess is what I'm

8    saying.  You would have had to have done whatever you've done

9    anyway.

10         MR. PIPITONE:  That is true, Your Honor.  That is

11    true.  But see, Mr. Hansen has not done anything other than

12    arguably initiated a lawsuit he has never participated in any

13    way, either through answering written discovery, presenting

14    himself for the conduct of his deposition, responding to the

15    motion to compel in any way, other than through Mr. Moulton,

16    who didn't really have instructions until just recently, and

17    those instructions, Your Honor, were, I want out of the suit.

18         Now what we've asked Mr. Moulton to do as well -- we

19    obviously have seen the email, but we've asked him to bring

20    the email with him for *in camera* inspection by Your Honor.

21    And there may be more instructions in it than I'm aware of,

22    but I obviously can't argue about something that I don't know.

23         THE COURT:  I guess the situation here in *Hood*, this

24    was a one-Plaintiff situation, it looks like the Defendant had

25    spent significant time and effort and resources in litigating

1   the Plaintiff's action, which is a little bit different than

2   what is before the Court.  I think the Defendant would have to

3   have taken the actions they've taken already.  This case in

4   *Hood* looks like it was nearing the end of discovery

5   approaching pretrial stages, which we're nowhere near.  And

6   the Court found that the late stage of the action favored

7   dismissal with prejudice.

8          I think it's kind of different than what we have

9   before us.

10          MR. PIPITONE:  Then, Your Honor, if I may request --

11   and I understand what you said -- if Your Honor would take an

12   *in camera* inspection of that email, it may contain

13   instructions that say, I don't want to participate, I never

14   want to participate, I'm sorry I even joined the suit.  I

15   don't know.  But it would comfort me and my clients to some

16   extent if Your Honor would take a look at that email.

17          THE COURT:  Mr. Moulton?

18          MR. MOULTON:  Your Honor, I have it available on the

19   phone.  He said that he's working in a foreign country --

20          THE COURT:  Do you mind if I look at it?

21          MR. MOULTON:  Okay.  Certainly.  And I'll put it out

22   there's a couple of other -- while I'm pulling it up here -- I

23   think there's some other differences in the case that are --

24   that we should consider.  Him being out of the country makes

25   it difficult, if not impossible to be involved in the case

1   anyway.  It's not really his fault.  The other part of this is

2   that we have multiple instances now where Total Screen

3   Solutions has reached out, or threatened, or coerced people

4   about participation in the lawsuit.

5        We have the email that we just filed on Friday where

6   we just -- or on Thursday -- Friday I think it was -- no,

7   Thursday we filed it -- with regards to Lauterbach getting

8   fired from Tri C (phonetic), the owner of the company, and

9   Total Screen Solutions heard his daughter, Brandy Burleson,

10  sent an email to another Plaintiff in the case that says that

11  she couldn't keep Lauterbach employed because he sued her

12  daddy.

13       We have another declaration from Plaintiff Silva

14  that we filed about how Total Screen Solutions is looking to

15  make sure he never got a job in the oilfield again.  Plaintiff

16  Lauterbach has also received that threat.  Plaintiff Hansen

17  also was threatened that if he came back -- ever came back to

18  Corpus, that Total Screen Solutions would kick the shit out of

19  him.  So with these sorts of threats out there, I think it --

20  we're not -- we can't be 100 percent sure is Hansen's decision

21  is completely voluntary.

22       Now I'll pull his email so you can look at it.

23       MR. PIPITONE:  Your Honor, while Mr. Moulton finds

24  that email for presentation to the Court, I don't want to

25  grace his comments with too much of a response, but with

1    respect to the Plaintiff, Hansen, there is absolutely nothing

2    of record one way or the other about any harassment tactics by

3    the Defendants.

4            And while I'm sure it is distasteful for Mr. Moulton

5    to bring up such allegations that are unsubstantiated, just as

6    it would be distasteful for me to bring up the possibility

7    that Mr. Hansen never wanted to be in this suit and was

8    influenced from outside sources to begin it in the first

9    place.

10           So I really don't want to dignify this harassment

11   and intimidation and the crass language with much more of a

12   response.  But I don't want it to be left unresponded to

13   either.

14           THE COURT:  Okay.

15           MR. MOULTON:  Your Honor, I have my email to him and

16   the response and another email to him that's gone unresponded

17   to.  If I may approach?

18           THE COURT:  Yes.

19           MR. MOULTON:  His email is the one with the gray A.

20       (Pause in proceedings.)

21           THE COURT:  All right.  The Court's dismissing the

22   case without prejudice.

23           MR. MOULTON:  Thank you, Your Honor.

24           THE COURT:  And that should then moot -- that motion

25   to compel only involved Hansen.  Is that correct?  That was

1    pending?

2            MS. IDALSKI:  Yes, Your Honor.

3            THE COURT:  So that DE 47 then is moot at this

4    point?

5            MR. MOULTON:  It is, Your Honor.

6            THE COURT:  Then there is the -- what does that do

7    to the motion to certify?  Did Hansen -- was he the one that

8    provided information regarding similarly situated --

9            MR. MOULTON:  No, Your Honor, we could never contact

10   him to get his declaration.  We have a declaration from

11   Mr. Lauterbach, the other named Plaintiff, and we have

12   declarations from four opt-ins, so for a total of five

13   declarations.

14           THE COURT:  Okay.  I guess let's address motion to

15   quash the subpoenas next, and then we'll address the

16   certification.

17           MR. MOULTON:  Okay.  Would you like me to start,

18   Your Honor?

19           THE COURT:  Yes.

20           MR. MOULTON:  Okay.  So Total Screen Solutions has

21   issued, or is attempting to issue subpoenas to three prior

22   employers of Plaintiff, James Lauterbach.  The scope of their

23   subpoenas to the employers is extremely broad, does not

24   exclude anything about their employment -- about his

25   employment.  It goes back to jobs he's had as far back as

1      1992.  They ask for everything possible under the sun.

2              He basically worked in the oilfield from about 1992

3      to about 2007, and then from about 2008-2010 he was

4      unemployed, and then started working for Total Screen

5      Solutions.  So any of these employers that they're seeking

6      information on are already three years before even this

7      lawsuit starts.

8              And, you know, whether or not he was terminated,

9      whether or not he was written up, whether or not he was paid

10     by the hour, whether or not he had benefits or was classified

11     as a 1099 employee or a W-2 employee, none of those things are

12     going to impact whether or not he's an independent contractor

13     with TSS, which is the issue in this case.  The number of

14     hours he worked for these prior employers won't have any

15     affect -- well, won't have any bearing on the number of hours

16     he had worked for Total Screen Solutions.

17             And it'll also harm Mr. Lauterbach because he's

18     seeking employment with these companies, he networks with

19     them, he calls these people up.  He is interviewing with one

20     of them, he is applying with another, another one he's called

21     and they said they don't have work right now, but, you know,

22     he's continuing contact with them.  And so if they get the

23     burdensome subpoena and have to spend time and resources

24     answering all these questions about him, and also being

25     notified of the fact that he is suing Total Screen Solutions,

1    it has a, you know, chilling effect on his ability to get

2    employment.

3         The other subpoena that Total Screen Solutions has

4    is for his cell phone records going back, you know, to January

5    2010 to -- until AT&T answers it, and he's only worked there

6    from June 2010 to May 2013.  And it's everything.  I mean

7    there's no restriction as to certain calls or certain times.

8         So every call he made when he's not working, every

9    call he made to an attorney, and he has -- he's not the --

10   this is not the only legal matter he's in.  Every call he's

11   made to somebody he's networking to for employment.  They will

12   all be in these records, and Total Screen Solutions only has

13   to run those numbers through a simple database to find out

14   everything about the people he's called.  And it's just

15   totally irrelevant.  I mean whether or not he calls somebody

16   on a weekend or on a day off, that has nothing to do with the

17   case.

18        Total Screen Solutions says that they need those

19   records to prove that -- you know, when he's working.  Well,

20   the problem with the phone records is that they're not going

21   to be a substitute for the time records that Total Screen

22   Solutions is required to keep under the Fair Labor Standards

23   Act.  They're supposed to know when he was working.

24        And if he has a phone call, even when he says he's

25   supposed to be working, it doesn't say -- it doesn't tell us

1    if he did it on a break, it doesn't tell us if he did the

2    phone while -- you know, he's on the phone while he was

3    monitoring equipment or doing some other passive activity.

4    You know, it doesn't -- it's not going to be a reliable

5    indicator of when he worked.

6          It's not going to be a reliable indicator of where

7    he was either.  The other reason that they say they needed it

8    is because they can -- you know, they want to somehow use it

9    to prove that if he's maybe not on the job site when he said

10   he would be.

11         The problem with cell phone records in that regard

12   is that they pick up signals or they -- you know, it's just

13   the nearest tower it picks up, and so they can pick up towers

14   45 miles away.  So he's out on a rig in a remote spot and he

15   makes a phone call, and that phone call happens to get

16   registered in a town 45 miles away because that's where the

17   cell phone tower is, it's going to make him look like he was

18   there when he was not.

19         You know, it's just it's not going to be a reliable

20   way to piece together time records that they didn't keep.

21              THE COURT:  Okay.

22              MR. PIPITONE:  I'd like to --

23              THE COURT:  Yes.

24              MR. PIPITONE:   -- defer to Ms. Idalski.

25              MS. IDALSKI:  Your Honor, there's a lot of

1    speculation with no evidence here.  So, you know, I'm going to

2    need to point out some of these things because Mr. Moulton

3    keeps saying that the Plaintiff, Mr. Lauterbach, is going to

4    be harmed because he's applying with these employers.  Okay.

5    So first let me address the harm.

6         There is no harm.  He's not applied with any of

7    these employers.  And, in fact, one -- there's -- we're

8    talking about three.  We're only talking about three

9    subpoenas, one of them is gray -- let me get the correct name

10   here -- Gray Wolf Drilling.  He testified in his deposition

11   last week that he failed a drug test and was fired from that

12   company.  He's already ruined his reputation with that

13   company.  He's not applying for a job with that company.

14        So first of all, this man is not out there applying

15   for jobs.

16        THE COURT:  When did he work there?

17        MS. IDALSKI:  He worked there 1998 through -- it

18   looks like 2002.  Let me explain why we want the records.

19        THE COURT:  Just tell me again, who are the other

20   two?

21        MS. IDALSKI:  Sure.

22        THE COURT:  Gray Wolf --

23        MS. IDALSKI:  One is Nabors, one is Gray Wolf and

24   the other is Thornton Drilling.  And I'll give you the dates,

25   Your Honor, pursuant to the Plaintiff's deposition.  He says

1     that he worked at Thornton Drilling from 2003 to 2007.  And

2     with respect to Nabors, he worked there at two different

3     times, 2000-2001, and he couldn't recall the date of the other

4     time he worked there.

5          So Plaintiff has to be able to show some type of

6     harm.  Okay.  There is no harm with requesting these subpoenas

7     and these companies finding out that Mr. Lauterbach has a

8     lawsuit.  That is not showing harm.  The Plaintiff has the

9     burden to show that they're not relevant.  Okay.  We have

10    shown that they're relevant, that they will lead to the

11    likelihood of admissible evidence, of discoverable evidence.

12         We've shown this because -- we've shown the Court

13    the *Gate Guard Services* case, and in that case Judge Rainey

14    specifically said that this information goes to the profit and

15    loss factor.  So whether a worker can increase their profits

16    by taking other jobs is highly relevant to this factor.

17         We need to know about Mr. Lauterbach's employment

18    before he was working at TSS, during the time he was working

19    at TSS and taking breaks in between jobs.  We only know about

20    three employers.  We've only sent out three subpoenas.  We

21    want applications, we want dates of employment and we want to

22    know when he worked at these employers, whether he applied,

23    whether he tried to get a job there, because if he did, it

24    shows that he could have earned a profit or suffered a loss

25    during the time he had these projects with our client.

1          So there's a case on point which says that this

2     information is relevant.  And the Plaintiff hasn't shown that

3     there's any harm in doing so.  How could there be harm --

4          THE COURT:  It just seems overly broad.  You're

5     asking for training records, disciplinary records, I mean

6     you're going beyond, you know, when he worked, how much he

7     worked, was he working there while he was working for your

8     company.

9          MS. IDALSKI:  Your Honor, the -- let me address one

10    other part of this.  The other factor, as you know, for the

11    independent contractor test, is the skill and initiative

12    factor.  And so we have to show -- or our argument is going to

13    be that these individuals for some of these jobs were skilled,

14    so we have to show -- if they say, No, we weren't skilled, we

15    didn't know anything, this job was simple.  But, in fact, they

16    were skilled.

17         And during Mr. Lauterbach's deposition he goes into

18    great detail about all of the things he learned over the years

19    and how he worked himself up the ladder and how he understood

20    how the rig process works.  So that's why we want training

21    records.  We want to what his job duties are, we want to know

22    what he did.

23         Those are the things that we're looking for that are

24    directly relevant to the case.  If the Court wants us to

25    narrow the subpoena, we'll narrow it the subpoena, but there's

1      no harm here.

2              THE COURT:  All right.  You want to address the

3      phone records?

4              MS. IDALSKI:  Pardon me?

5              THE COURT:  Do you want to address the --

6              MS. IDALSKI:  Oh, sure.

7              THE COURT:   -- phone records?

8              MS. IDALSKI:  With respect to the phone records,

9      it's the same thing.  I mean the phone records are -- again,

10     where is the harm.  I mean we request phone records in every

11     employment case that's filed.  I mean the Defendant has the

12     right to conduct discovery.

13             Here, this Plaintiff, unlike the other potential

14     punitive class action members, are -- is saying that he worked

15     all the time.  He worked 70 hours a week, he worked, you know,

16     three days straight, he worked all the time.  So he also

17     claims, you know, that he called certain people on the job,

18     and we have the right to verify what he was doing, where he

19     was working.

20             We're not going to take the time to skip trace his

21     telephone records.  We don't care about his personal

22     information.

23             THE COURT:  So what is it you want?  Why can't you

24     narrow it then?

25             MS. IDALSKI:  Well, we -- you know what, we can

1    narrow it, and we agreed to narrow it to the dates of his

2    employment with TSS, which I believe is 2010 to 2013.  So we

3    can certainly narrow it within that time frame.  We're not

4    going to get text messages, Your Honor, because we can -- the

5    companies just don't save text messages, so we've said, That's

6    fine, we don't need text messages.

7            But we do want to know if he was working somewhere

8    else, we do want to know if he was on the phone and in -- by

9    area code if he was in other areas other than where he was

10   supposed to be.  Those things --

11           THE COURT:  Okay.  Getting the phone records, how is

12   that going to tell you he was working somewhere else?

13           MS. IDALSKI:  Well, if he's in different -- various

14   area codes, Your Honor, if he's on the phone for, you know,

15   lengthy periods of time.  We will match up the telephone

16   numbers of the employers that we do know to see if he was

17   working for those individuals.  I mean it could potentially

18   show -- it could lead to the discovery of admissible evidence.

19           We have to be able to do discovery on whether or not

20   this man was working as many hours as he says he was working.

21   We have the right to test that.  And he's already -- he's got

22   a lapse in memory, or perhaps at worst even some dishonesty

23   with respect to his criminal record.  So, you know, these

24   records are going to show us, and verify some of his

25   statements.  And it does go to his credibility.

1          Now if it comes to the point where Mr. Moulton wants

2     to file a motion in limine if this thing gets that far, then

3     he can do so.  But right now we're in the discovery period and

4     where is the harm to this man?

5          THE COURT:  Okay.  Any final comments?

6          MR. MOULTON:  Yes, Your Honor.  Back to the employer

7     subpoena, she -- his deposition testimony was not -- has to be

8     clear on exact dates, and it also -- he wasn't -- you know, it

9     kind of -- depending on where you look in the transcript, you

10    get kind of a different feel for this.  But the -- it's true

11    that he said at one point that he did not apply with Gray

12    Wolf, but later he says that he had called Gray Wolf and they

13    weren't hiring.  And so he's in contact with them.

14         Fortin (phonetic), he has actually gone to a -- you

15    know, he's actually done an interview with them.  Nabors, he's

16    been in -- he's also contacted, and they're at these job fairs

17    that he's going to and that he's trying to get employment with

18    them.  So these are employers that he does have an interest

19    with still.

20         Now whether or not he worked for them in 2002, 2007,

21    1992, that has nothing to do with this case.  You know, the

22    skills that --

23         THE COURT:  I guess I'm having trouble with that.

24    If we're trying to figure out was he working for other people

25    while he was employed with the Defendant here, why are we

1      going way back?

2                   MS. IDALSKI:  Because, Your Honor, we don't trust

3      those dates.  Okay.  They go back and forth between --

4                   THE COURT:  Wait, no, no, I'm talking about -- he

5      worked for your company between 2010 and 2013 --

6                   MS. IDALSKI:  Yes.

7                   THE COURT:   -- so you would want to know was he

8      working at other places during that time --

9                   MS. IDALSKI:  Yes.

10                   THE COURT:   -- period.

11                   MS. IDALSKI:  Absolutely.

12                   THE COURT:  So why are you going way beyond that?

13                   MS. IDALSKI:  Because he's now contacting these same

14     companies for work, and who's to say when he was working at

15     TSS that he wasn't contacting those companies for work.  Your

16     Honor, I don't like it --

17                   THE COURT:  Why can't you limit it to the dates --

18                   MS. IDALSKI:  We could.

19                   THE COURT:   -- when he worked --

20                   MS. IDALSKI:  We could do that.

21                   THE COURT:   -- for your --

22                   MS. IDALSKI:  We absolutely could do that.

23                   THE COURT:  Okay.  Because that is one of the

24     complaints, that we're going --

25                   MS. IDALSKI:  Yeah.

1           THE COURT:   -- way back.

2           MS. IDALSKI:  We could -- no, we said we'll limit it

3     to the dates of the employment with TSS.

4           THE COURT:  The employment records also, not just

5     the phone records, you would limit it.

6           MS. IDALSKI:  Yes.

7           THE COURT:  Okay.  I mean because the way I read

8     it --

9           MS. IDALSKI:  Well --

10          THE COURT:   -- it was very --

11          MS. IDALSKI:   -- you know --

12          THE COURT:   -- broad.

13          MS. IDALSKI:   -- well, Your Honor, we would like

14    the training records though, so with respect to questions such

15    as, you know, if there's any employment records between these

16    dates with respect to -- well, the question's going to be,

17    Provide any applications that were between these dates, right,

18    the relevant dates.  But then we also --

19          THE COURT:  And the relevant dates are going to be

20    when he was working for TSS.

21          MS. IDALSKI:  That's right.

22          THE COURT:  And then also we need the training

23    records.  Okay.  So we will need the training records during

24    the time that he was employed with these companies.

25          MR. MOULTON:  Your Honor, if I may?

1          THE COURT:  (No verbal response.)

2          MR. MOULTON:  You know, if he's working at any of

3   those companies when he's working at TSS, and he's not, if he

4   were, those companies would have issued a 1099 or a W-2.  And

5   we've offered to provide those to show -- and they would show,

6   if he ever worked with them during this period.  We can go to

7   that --

8          THE COURT:  But why can't we start there with 1099

9   and W-2s, and then if he was working there, then we'll

10  consider --

11         MS. IDALSKI:  Your Honor, we -- they refused to

12  provide any -- the man hasn't provided tax records in 12

13  years.  They haven't produced any 1099s --

14         THE COURT:  He's the one --

15         MS. IDALSKI:   -- or W-2s --

16         THE COURT:   -- he's the one bringing it up, the

17  1099s and the W-2s, willing to provide them.

18         MS. IDALSKI:  Your Honor, how do we know they're

19  providing us -- that his client is providing him with all of

20  the documents?  He's lied so many times already.  And again,

21  going back to this Gray Wolf, there's nothing in the

22  deposition -- Mr. Moulton is stating facts to the Court that

23  are not true, that he ever applied to this employer.  He was

24  fired from that employer for failing a drug test.  So we need

25  to stick to the facts here.

1          THE COURT:  I'm just saying I think your request is
2     way broad --

3          MS. IDALSKI:  Well --

4          THE COURT:   -- overly broad.

5          MR. MOULTON:  Okay.  We'll narrow it then, Your
6     Honor, to --

7          MR. MOULTON:  Your Honor, if I may?

8          MS. IDALSKI:   -- to those --

9          MR. MOULTON:  There's another way to find out about
10    the 1099 and W-2s that don't involve whether or not, you
11    know -- that don't even involve Mr. Lauterbach.  We don't have
12    to rely on him.  We can send, you know, a request to the IRS
13    for his W-2s and 1099s reported by any employer during these
14    dates.  We can get that information, and I've offered that,
15    and they don't want that.  They want everything under the sun.

16         MS. IDALSKI:  That's not true, Your Honor.

17         MR. MOULTON:  And the training records --

18         THE COURT:  Okay.  Why can't we go about it to look
19    at it that way.  And if he, in fact, did work for these
20    employers while he was working for TSS, then I may allow, you
21    know, some further discovery from their files.  But what I'm
22    hearing here is he's saying, I wasn't working there during
23    this time period.  And you're saying, Well, we don't know if
24    he was or not because we can't trust what he says.

25         MS. IDALSKI:  Exactly.

1              THE COURT:  So why can't we go about it through a

2      release from the IRS returns?

3              MR. PIPITONE:  Your Honor, he didn't -- he's not

4      filed taxes in the last 10 or 12 years.

5              THE COURT:  But I thought I read somewhere that

6      he --

7              MR. MOULTON:  Right.  So --

8              THE COURT:   -- was getting on track with that or --

9              MR. MOULTON:  Right.  So he has -- there's been two

10     times with this.  He had several years and he, you know, he

11     went back and got -- you know, paid back those taxes and got

12     the release of lien.  At this point now, for the last several

13     years, which includes this employment here, he has also not

14     filed.  He's working with an accountant to file.

15             But the thing is, that would still only be what he

16     would provide.  But employers have to send that information to

17     the IRS.  The IRS has it, the IRS already knows what he was

18     paid.

19             THE COURT:  Right.  Why can't we do that?

20             MS. IDALSKI:  Your Honor, this is really

21     restrictive.  We can do that, but what about the training

22     records, what about the other --

23             THE COURT:  Well, what if you -- oh, because you're

24     wanting training records that go way back --

25             MS. IDALSKI:  Right.  Right.

1          THE COURT:   -- even if he wasn't there.

2          MS. IDALSKI:  And applications as to when he

3     applied.  If he applied but wasn't employed, we wouldn't get

4     that information from the IRS.  We're looking for

5     applications, contacts where he's looking for a job, we're not

6     looking for disciplinary records per se.  Okay.  But these

7     things are very reasonable, Your Honor.  We're in the

8     discovery stage, we're the Defendant, we have the right to

9     discover these things.  It doesn't mean that they're coming

10    into any trial.

11         THE COURT:  All right.

12         MR. MOULTON:  Your Honor, if I may?  On the

13    disciplinary records, I mean --

14         THE COURT:  They're not looking for that.

15         MR. MOULTON:  Okay.  And then -- oh, the -- I'm

16    sorry, what I meant to say is the --

17         THE COURT:  Training --

18         MR. MOULTON:   -- training records.  If he's a

19    skilled worker, if he -- you know, as a driller.  Right?  He

20    worked as a drilling for years or the floor handler, whatever,

21    that's not skilled.  But if he worked -- if he had training

22    and skills that relate to that job, that's completely

23    different about the skills that are required to be a solids

24    control technician.

25         And that's the issue here.  It's not just generally

whether or not he's skilled, it's whether or not with this
employer if it's -- there's two things, it's not -- you know,
when you look at skill there's two issues.  It's not only the
skill required for that job, and this job is done by pizza
delivery boys, by the way, and guys who have experience, but
it's also the real sense to help you decide whether or not
he's in business for himself, as to whether or not he's using
his skill and initiative to obtain more work, to be in
business for himself, to get contracts.  Right?

          And so whether or not he has experience in the
oilfield from before and the training he received does not
tell us about the skills required to be a solids control
technician, because somebody can be, you know, a driller with
one company and then he can go sweep floors somewhere else.
Right?  I mean the fact that they were --

          THE COURT:  Well, what was his job when he worked at
these different companies?

          MR. MOULTON:  He was -- he worked as a floor hand
initially, like everybody does in the oil industry.  He's also
been a tool pusher and he's also been a driller.  And tool
pusher and driller are, you know, are pretty big jobs.  But
running the solids control centrifuge is a pretty simple job.

          MS. IDALSKI:  Your Honor, these are issues of
disputed fact, and this is the discovery stage and we're
entitled to know what his experience is, what his skills are,

and to match those to what we were -- to what our clients were

looking for for these technicians.  He's arguing his case

right now.  We're in the discovery stage, we're just asking

for training records, job descriptions and duties.

THE COURT:  For the employment records, and I think

I'm going to allow them to direct, you're going to have to

limit your -- the scope of your request to the employer, but I

think we can do W-2s, 1099s for the time frames he worked for

TSS, and I'll allow you to ask for training records and

applications.

The applications I guess would be during that time

frame also, but the training records would cover how far back?

MS. IDALSKI:  From the beginning of his employment,

whenever that is.  But we'll put that in the request, from the

date of hire to the date of termination.

MR. MOULTON:  Your Honor, I don't understand why the

applications are going to matter.  I mean if you're working

somewhere and you are looking for other jobs at the time, it

says nothing about whether you're an employee or independent

contractor.  People are always looking for work.

THE COURT:  So what are you looking for in terms of

the applications?

MS. IDALSKI:  Your Honor, that's exactly what we're

looking for, we want to know if he had the opportunity to make

a profit or suffer a loss during this time by taking on other

1    jobs, by applying for other jobs.  Did he have that

2    opportunity.  The case law is extremely clear and he hasn't

3    addressed the *Gate Guard* case at all, that whether or not

4    these individuals were allowed or had the opportunity to go

5    work for someone else during the time that they had breaks.

6    This would show -- this goes to the economic reality that goes

7    to profit and loss.  So if he's contacting these other --

8           THE COURT:  All right.  I've limited it already to

9    those three areas.

10          MR. MOULTON:  Well, Your Honor, on the *Gate Guard*

11   case, I'm just ignoring 5th Circuit precedent.  You know, in

12   our most recent -- you know, in our reply about this, there's

13   specific cases that go back for decades now where additional

14   income on the side is not relevant.  It doesn't change your

15   status.  You can -- you know, take for example Mr. W Fireworks

16   stocks --

17          THE COURT:  And it might not be, it may not come in

18   at trial, but she's --

19          MR. MOULTON:  Right.

20          THE COURT:  -- right and this is -- we're in the

21   discovery stages, so I think they're entitled to see what

22   might be there.  But we need to address the phone records now,

23   which I think is extremely broad, your request, again.

24          MR. MOULTON:  Well, so, you know --

25          MS. IDALSKI:  Your Honor --

1          MR. MOULTON:   -- anybody who's working anywhere,

2    who's going to call all kinds of people when they're off duty,

3    and they're going to get all that.  They're going to get

4    every --

5          THE COURT:  Yeah, I need to figure out how we're

6    going to limit this.

7          MR. MOULTON:  Right.

8          THE COURT:  And we'll let the Defendant see.

9          MS. IDALSKI:  Okay.  Your Honor --

10          MR. MOULTON:  Well, Your Honor, if I may, I have

11    some suggestions on that.

12          MS. IDALSKI:  Can I --

13          THE COURT:  Let me see what she wants --

14          MR. MOULTON:  Okay.

15          THE COURT:   -- and then you --

16          Go ahead.

17          MS. IDALSKI:  Your Honor, we agreed to limit it to

18    the dates of his employment, and that's what we're limiting it

19    to.  I mean we want to know if he says he was working but yet

20    his phone records show he was somewhere else, in Florida or

21    some other state or some other area.  Certainly we're going to

22    be looking at that, or if he's not where he says he is.  He's

23    asking for a lot of money, he's saying he worked around the

24    clock.

25          These phone records, they're not time records, but

1    they're certainly going to test his credibility as to where he

2    is and it will lead to the discovery of admissible evidence.

3    We are not going to be skip tracing numbers and this -- all

4    these, you know, paranoia -- paranoid assertions that have no

5    basis.  I mean it's a simple request for telephone records.

6          MR. PIPITONE:  Your Honor, if I might just add one

7    thing.  Mr. Moulton just said a moment, he said, If my client

8    is on the phone during the hours he's not working.  Well, Your

9    Honor, in this case -- and I took Mr. Lauterbach's

10    deposition -- he's saying he worked -- at one point he worked

11    three days straight.  He's saying he worked as much as a 100 a

12    week.

13          Well, if Mr. Moulton is correct, that these phone

14    records will show that he's on the phone during the hours he's

15    not working, that's exactly what we're looking for because

16    that will show then the hours he's not working and then from

17    that we can deduce the hours that he was working.  That's why

18    they're relevant, Your Honor.

19          MR. MOULTON:  Well, he's provided a chart, you know,

20    based on his estimate of when he's working, because we know,

21    based on the payroll records, the days that he's on the job.

22    And, you know, as TSS will tell you, they don't have set break

23    times, they don't have necessarily set hours.  And so let's

24    say we're looking at his phone records and we see a call at

25    five o'clock to some random person.  That doesn't tell us that

1    he was -- you know, it doesn't tell us that he wasn't working

2    then or that he wasn't on a break.  It doesn't tell us about

3    the hours he worked.

4            And on average he's saying 12 hours a day.  And

5    there were times when he was working two rigs at once, and

6    he's going back and forth between these two rigs.  And if you

7    make a phone call while you're driving, that doesn't affect

8    the compensability of that time.  If it's picking up a cell

9    phone tower 45 miles away, I mean that's not going to tell you

10   whether or not he, you know, was there or not.

11           So that's why we would propose limiting it to --

12   well, and the other issue that could be -- I admit could be

13   relevant on the phone calls between him and managers or

14   supervisors at Total Screen Solutions.  We know those numbers,

15   we can limit it to those numbers.  We can also limit it to, if

16   the location is farther than 45 miles away from the rig, or

17   his route, that would possibly indicate that he's not at the

18   rig or on the route and that could be relevant.  Right.  ]

19           But if it's within some, you know, reasonable

20   distance of where he's supposed to be, for all we know he's

21   there.  Right?  We don't -- it's not going to tell us.  What

22   it is going to do then is just give them, you know, everything

23   about him, every single call he's made for over three years to

24   anybody at any time.

25           THE COURT:  How do you limit that?

1           MS. IDALSKI:  Your Honor, I don't think there's a

2    way limit it.  This is common discovery request, this is

3    discovery, it's likely to lead to the -- to admissible

4    evidence here.  If there is something in there that, you know,

5    ultimately when we come to prove our case and we have to put

6    on our evidence, if he wants to keep it out of, he can keep it

7    out, but we're in the discovery stage.  There's no way to

8    limit it any more than by dates.  We can't limit it by

9    telephone number.

10          We're going to be looking at the times that he's on

11   the phone, the length of times that he's on the phone.  We're

12   going to be looking at area codes, we're going to be looking

13   at dates.  But I don't know how you limit telephone numbers.

14   We're certainly not interested in, you know, anything personal

15   or his personal life.

16          MR. MOULTON:  The area codes aren't going to say

17   anything.  It's a cell phone.  The area code's just --

18          THE COURT:  All right.  The Court's going to deny

19   the motion to quash subpoenas regarding the phone records.

20   They'll be limited to the dates of his employment with TSS.

21   It's my understanding there's not going to be any texts

22   involved.  Anything else on that issue?

23          MS. IDALSKI:  Not on this issue, Your Honor, but we

24   do have the motion for conditional certification.

25          THE COURT:  Okay.  So let's proceed with the motion

1      for conditional certification, Mr. Moulton.

2           MR. MOULTON:  Yes, Your Honor.  So conditional

3      certification under FLSA is essential to its enforcement.  You

4      know, Plaintiffs can proceed collectively, they're similarly

5      situated to collectively, you know, earn their overtime pay.

6      Similarly situated on, you know, traditional analysis that

7      most of the Courts look at is if, you know, if you're

8      performing similar job duties, if you are paid the same way,

9      if you are, you know, basically subject to the same sort of

10     policies.  Right.

11          And that's exactly what we have here.  We have one

12     category of worker, which is hand or solids control tech,

13     they're all paid a day rate, and they're all classified in the

14     same way.  They work similar schedules, they are usually

15     assigned two sit hands to a rig and they each take a tower.

16     So, you know, you take a day tower or a night tower and it --

17     that corresponds to day hand, night hand.

18          And, you know, this is a classical situation for a

19     conditional certification treatment.  You just have one group

20     of employees that are all employed by Total Screen Solutions

21     and have -- I'm sorry, the same policy, denied overtime under

22     the exact same policy.

23          There is not differences among them that are

24     material to the certification analysis.  Courts that look at

25     whether or not the punitive class members are economically

1    dependent upon their employer, in other words, go to the
2    ultimate issue in the case, you know, the Courts have looked
3    at that and they said, No, we're not going to do that because
4    that's a merits-based inquiry.  That's like trying to decide
5    the answer to the case at the stage of whether or not we're
6    going to send a notice out to the employees to let them know
7    if they can join the case.

8         And that's what conditional certification is.  I
9    mean the Supreme Court's come out recently in the *Symczyk v*
10   *Genesis Healthcare*.  It's not a class action, you know, we're
11   not asking to have this already binding on the entire class.
12   Instead it's conditional certification, which is a very
13   lenient and low standard.

14        And basically what it is, it just simply means
15   notice goes out to these people, they get a chance to know
16   about the case and they can have an opportunity to join on if
17   they like.  If they join on, then the case proceeds
18   collectively through discovery and we find out more about the
19   case.

20        At the close of discovery then usually if the
21   employer feels the need, they can move for, you know, a
22   decertification to prove that they are, in fact, not similarly
23   situated.  That's their right to do that.  At that time, with
24   all the facts before the Court, then you're able to analyze
25   whether or not they are, in fact, similarly situated.

1           But right now we -- you know, discovery is in its

2     infancy, we have very little done.  And, you know, usually

3     what Courts do, they just consider the pleadings and the

4     declarations on file from the Plaintiff.  And those

5     declarations show that these guys are similar.  Right?

6           They don't -- they're not exact, I mean some guys

7     may have had to work, you know, two rigs, or some guys may

8     have had to have a little stretch where they were on for 70

9     hours because there was, you know, something wrong with the

10    rig.  But overwhelmingly it's 12 hours a day, classified the

11    same way as an independent contractor, paid overtime -- not

12    paid overtime.

13          Now the other thing that's interesting too is, a lot

14    of Courts have just looked at, well, if the employer can just

15    have a blanket classification, then the Court can analyze that

16    blanket classification.  That's what we have here.

17          They've answered in discovery that Nick Mills made

18    the determination to, you know, make the solids control

19    technicians independent contractors without further analysis.

20    And so, you know, if he can do that, the company can make that

21    blanket classification based on what they know, then that's a

22    decision that we can also determine on a collective basis

23    whether or not it's actually valid or not.

24          So we think the -- that these employees are entitled

25    to know about this case and have an opportunity to join on if

1    they'd like.  We already have -- you know, at this point we've

2    had I think 11 people join on.  Aaron Hansen is withdrawing,

3    so we're at 10.

4                  THE COURT:  All right.

5                  MS. IDALSKI:  Your Honor, we've got a couple of

6    exhibits to show you.  This is the total of what goes out

7    in --

8                  MR. PIPITONE:  Your Honor, where would be the best

9    place for you to see these?  I know in your courtroom you have

10   an easel, but we don't have one here.

11                 THE COURT:  Right.

12                 Brandy --

13                 MR. PIPITONE:  I can put them on a chair or

14   something like that and take and pop them off?

15                 THE COURT:  That's fine.  Probably --

16                 MR. PIPITONE:  Maybe the jury box?

17                 THE COURT:   -- probably right here.  Yes, that'll

18   be fine.

19        (Pause in proceedings.)

20                 MR. PIPITONE:  Your Honor, is that visible to you?

21                 THE COURT:  Uh-huh.  That's good.  Yeah, that's

22   fine.

23                 MS. IDALSKI:  It might be easier, Judge, if we turn

24   it?

25                 THE COURT:  That's fine.

1          MS. IDALSKI:  Your Honor, we have some real

2    concerns, and Mr. Moulton's right, usually Courts just sort of

3    rubber stamp collective actions at the very early stages and

4    grant conditional certification and go forward and then

5    eventually decertify it.

6          But this is not one of those cases.  And here is --

7    we're all in this together.  We need to figure out whether or

8    not this is going to benefit the judicial system, whether it's

9    going to benefit the parties to all proceed at the same time.

10   And it's completely up to the Court.  The Court has complete

11   discretion to do whatever the Court wants to do.

12          Plaintiff does bear the burden.  Based on what he's

13   just stated and based on his papers, he's not proven that

14   these individuals are similarly situated.  And he can't.  And

15   the reason why he can't is because, number one, it's hard to

16   do so in an independent contractor case because the standards

17   are different.  But it's not just that this is an independent

18   contractor case.  It's that we don't have any common

19   supervisors, we don't have a plan, we don't have a policy, we

20   don't have control.

21          We've got these sit hands who are out there on these

22   rigs and they are reporting to these various company men.  And

23   the company men set their hours, tell them when they can move,

24   tell them what to do.  All of them are with different

25   companies, these companies are our clients, some of them are

not with our clients, some of them are independent contractors

and they're hired by other companies to come in to let's say

Marathon and be the company man.

So what we have here is we've got potentially in

this class, and I'm being very conservative with my numbers,

50 sit hands.  We have James Lauterbach testifying, or

producing paperwork that he reported to, based on his ticket

reports, about nine company men in the course of a year.  We

have Brandon Nees (phonetic) in his declaration submitted with

the Court -- to the Court with our motion that he reported to

11 company men.

All telling them to do different things, all having

them do -- work different hours. Some of them are working

backhoe, some of them are not, some of them are -- they're all

doing different job duties.  Some are allowed to go in the --

to leave and go home, some have to stay there.  They all had

different working conditions.

So where does this leave us?  This leaves us with

our having to track down potentially 500 company men, and this

is the exact reason why Courts do not grant conditional

certification.  And we're not in a position right now where --

we're at the leniency stage where this just got filed and we

don't know anything.  We've been at this for nine months.

And this is -- believe or not, some of these

individuals out there really are -- I know it's hard to

1    Mr. Moulton to believe that, but they really are independent

2    contractors and that's how it's structured.  So we are going

3    to have -- if this is conditionally certified, and one of the

4    factors we have to prove is control, it is going to be a mess

5    because we don't know who these company men are.  We know them

6    on the service sheets as, you know, Pee Wee and Bubba and Two

7    Tom and Tee Wee, we have first names.  Our clients don't

8    necessarily know who they are because they're independent

9    contractors of the client's.

10          Now in the *Fabato* (phonetic) case, which you had --

11   which you may still have before you, but you had before you at

12   one time and wrote the decision, that case was conditionally

13   certified, and like this one there were site hands or closed-

14   loop operators, but in that case they all reported to the same

15   supervisors.  They all had the same policy, they all had the

16   same plan, they all had the same working conditions.

17          So in collective -- in independent contractor cases,

18   the standard is different, and I just want to read this quote

19   from both a Supreme Court case and it's an Eastern District of

20   Pennsylvania case which Judge Rainey relied on in the *Andel*

21   (phonetic) case, which is almost -- it's not the *Gate Guard*

22   case, it's called the *Andel* case, which is like this one.

23          But when analyzing -- when a Court analyzes a motion

24   for conditional certification of a collective action based on

25   allegations of independent contractor misclassification, the

1    Court,

2         "Must analyze whether the punitive collective action

3         numbers are similarly situated with respect to the

4         analysis it would engage in to determine whether the

5         workers are employees or independent contractors."

6              And this is *Bam Boss v Delta T Group* (phonetic),

7    it's an Eastern District of Pennsylvania case, 2010, cited in

8    our brief.

9              Quote, and this is a Supreme Court case, *Hoffman v*

10   *LaRosa*,

11        "The Court cannot look to Defendants uniform

12        classification of workers" --

13             Okay.  Like Mr. Moulton wants you to, that they're

14   all sit hands, or it's common payment procedures, that they're

15   all just getting a day rate.  Instead, it must determine

16   whether the proof to demonstrate that the workers are

17   employees or independent contractors can be applied to the

18   case as a whole.

19             We don't have to prove these five elements right

20   now.  No one has to do that.  But the Court has to look at,

21   gee, am I going to be able to look at the control factor and

22   is it going to -- do we have common policy that's going to

23   apply to all these people, or am I going to have to look at

24   this on an individual basis.  And right now we've got 10

25   people that want to opt in, or eight, two are in, one is out,

1    and there's potentially 50 more with all of these additional

2    company men.

3           So this is the same situation that Judge Rainey was

4    faced with in the *Andel* case.  He was dealing with welders.

5    And he didn't conditionally -- it was a magistrate judge

6    initially that said, No, we're not going to conditionally

7    certify this, and then Judge Rainey affirmed it.  And the

8    reason was because the Court said the number of hours each day

9    and each week varied significantly.  Okay.  And we already

10   have evidence, based on Mr. Lauterbach's deposition, that he

11   worked 12.5 hour daily shifts and that during the last year of

12   his employment he worked as many as 70 in a straight week.

13          On the other hand, sit hand George Shanefelter

14   (phonetic) works his hours out with the sit hands and he works

15   six hours.  Sit hand Brandon Nees testified that 50 percent of

16   the time he's working six hours, the other 50 percent of the

17   time he leaves and does other things, it just depends on what

18   the company man wants us to do.  And we work the whole shift

19   or we don't.  Sometimes we only work for the first three days,

20   depending upon what the company man wants.

21          So if you look at the declarations, which are

22   already in evidence, and you look at Mr. Lauterbach's

23   deposition testimony, they are reporting to these company men,

24   and the company men are setting the working conditions.  So

25   they can't be -- they absolutely cannot be similarly situated

1    in this case.

2              If we had a common supervisor who was setting hours

3    and duties and other requirements, we might be able to do

4    that.  But we can't.  And that's the issue.  We even got

5    Plaintiff Lauterbach testifying in his deposition that he

6    reports to the company man.

7              And page 240 to 241,

8        "Question:  Well, I notice on your service reports that

9         they all have 'check in with the company man'.  Is that

10        somebody that you would report to?

11        "Answer:  Yes, I would check with him.  We dealt with the

12        company man because he would get a MUD report on what the

13        solids were and just check with him, you know, see if

14        there was anything he thought I needed to give attention

15        to with our equipment, see what the solids were, if there

16        was anything I needed to do, needed to change as far as

17        the way we were running our machines, stuff like that."

18        Page 250 in Mr. -- Plaintiff Lauterbach's

19    deposition,

20        "Question:  Okay.  Once you figured out the job,

21         especially because of the all the experience you had from

22         the drilling site, your contact back to Total Screen

23         Solutions became minimal, didn't it?

24        "Yes."

25              Page 244,

1          "And so what they're telling you is, Mr. Lauterbach,

2     you're working out there for these people.  You've got to

3     check in with the company man for instructions.  Right?

4          "Answer:  Yes."

5             Page 246,

6          "Question:  Were there ever times when you were out on

7             the rig and you would actually leave the rig during the

8             time you were assigned to work.

9          "Answer:  If they were idle and the company man needed

10            something from town, and I needed something from town, I

11            would check with the company man, like I was told to do,

12            you know, and if we were going to leave, just get with

13            the company man, and I'd pick him up something, or he'd

14            pick me up something."

15            Lauterbach submitted service logs and reports to the

16     company man, page 257.  Now Mr. -- or Plaintiff Lauterbach

17     wants to say, Well, I actually reported to Don Holloman

18     (phonetic), and he was one of the service tech supervisors.

19     But in his deposition he said, on page 270, that Don Holloman

20     only came to the job site once or twice a month.

21            Page 305,

22         "Question:  If you didn't have a problem, was there any

23            requirement to report it to Don?

24         "Answer:  No, I normally didn't call him unless I had a

25            question about the machines."

1        After about six months on the job, Don told him to

2    stop sending daily service reports to TSS, page 257.  So what

3    we have here is we don't have anyone at TSS telling these

4    individuals what to do.  They are not similarly situated.

5    Yes, they are sit hands, yes, they are paid a day rate, and,

6    yes, they go out to oil rigs that are clients' of TSS.

7        But the Plaintiff has not proven at this stage that

8    these individuals are similarly situated, and if we proceed

9    with a collective action at this point, we are going to have

10   to track down -- and I don't even know if it's possible -- all

11   of these company men to find out what -- to prove that all of

12   these people were doing different things.

13       We already know right now that they were doing

14   different things and they reported to different -- all of

15   these different people based on the Plaintiff -- Plaintiff's

16   deposition and based on the declarations of three, four and

17   five of the sit hands.  So this is not the lenient stage.

18       We are well past that.  We are nine months into

19   that.  The Court, at this point, doesn't -- even with the

20   *Lusardy* approach, we don't need to go down that road, we don't

21   need to have a certain amount of discovery.  There's cases

22   after three months of discovery, applying this approach is

23   reasonable.

24       And again, the case that I cited with respect to

25   Judge Rainey is *Andel v Patterson, UTI Drilling Company*,

1  Southern District of Texas, February 15, 2012.  And the reason

2  it was not certified is because the number of hours worked

3  each week varied, the number of hours each day varied, the

4  pattern of days on and off varied, the pattern of invoice

5  submission varied, and the length of time each Plaintiff

6  worked for the Defendant varied significantly.

7         We have the exact same situation here, and we're

8  really concerned, Your Honor, that if this gets conditionally

9  certified, it's going to be a mess because we're going to have

10  to look at each individual person and determine whether or not

11  that person's an employee or an independent contractor based

12  on all of these factors, namely whether -- how these company

13  men treated them.

14         THE COURT:  All right.

15         MR. MOULTON:  Your Honor, if I may approach?

16         THE COURT:  Yes.

17         MR. MOULTON:  The situation that we have here with,

18  you know, these Plaintiffs being assigned to different

19  locations is extremely common.  This happens all the time.

20  You'll see it with the janitorial industry, you'll see it in

21  the farming industry, you'll see it in welding industries.

22  And these are all cases where they're classified as

23  independent contractors.  And what the Courts have realized is

24  that you don't have to have direct control for them to be your

25  employees.  You don't have to be supervising them every day.

1            You know, the *Antenna/Farms* comes to mind, *Antenna v*

2    *CNS Farms*, 11th Circuit.  You don't have to -- see, under the

3    very traditional principles of employment law, under agency or

4    control factors, you know, that's the traditional standard,

5    but the Fair Labor Standards Act is meant to be extremely

6    broad, and it has, it's the broadest definition of employee

7    that there is.  And it's meant to get employers who don't

8    directly control their employees.  And Courts routinely grant

9    conditional certifications in cases like this.

10            Because the reason is, is that we're not talking

11   about our guys' relationship with the company men, whether or

12   not they're employees of the company man.  What we're

13   challenging is whether or not the control that does exist,

14   though not exactly the same, is from the company men.  The

15   control from TSS, whether they're similarly situated in that

16   regard, and they are under either one of our -- if you take

17   their point of view or you take our point of view.

18            If you take TSS's point of view that there's

19   absolutely no control, we can decide on a collective basis

20   whether or not there is any control.  If you take our side

21   that they control their pay, that they control, you know,

22   whether or not they're day or night, which basically

23   determines their hours, the 6:00 a.m. to 6:00 p.m., and then

24   6:00 p.m. to 6:00 a.m., you know, it's two different shifts,

25   whether or not there are policies whether they can hire other

1   workers to work for them, whether or not they have to provide

2   those services on their own, whether or not they're subject to

3   TSS's policies about how to care for and service the equipment

4   in the duties that they're doing.

5        And all our guys have testified unanimously on these

6   issues that there is a level of control with TSS and that they

7   are similar with regard to TSS.  And so it -- I understand

8   Defendants' position that, you know, these guys, you know, are

9   on a rig and on a client location like that, the guys -- you

10  know, the company men are in charge of that location, but

11  they're still subject to a level of control from TSS.  And

12  what we're challenging is that classification, not whether or

13  not they are also employees of the drilling company.

14       Now all the other factors -- that's just one, right,

15  and, you know, you look at -- the Court's saying, Well, you've

16  got to look at the economic reality of the situation to see,

17  you know, how important each factor is.  Obviously in

18  situations in industries where you're being assigned to other

19  locations, which is extremely common, the direct supervision

20  is not as a relevant.

21       This case is not *Andel*.  I don't even understand why

22  a -- what the Court means by a -- the *Andel* Court meant by a

23  different pattern of invoice submissions, but what I'm

24  assuming is that it was just -- that it must have been just a

25  jumbled mess of when people worked and they just turned in

time whenever.

That's not the case here.  They turn in their time sheets every 15th and 30th, or 31st as the case may be, and on each of those time sheets they show exactly the days they worked and the day rate.  These day rates don't change, they -- you know, they're not bidding each time like a true independent contractor would.

They're not providing the -- there's no opportunity for profit or loss if you don't have a control over your day rate, and you don't pay for the expenses.  Total Screen Solutions provides centrifuges and the dry shaker screens and tanks.  I mean this is huge capital investment that TSS has to provide, and our guys don't provide any of that.  Our guys don't even provide the wrenches and the specialized tools that they have to use on the centrifuges.  That's all provided by the company.  And the company provides their coveralls, and they provide pens.

And so they're similarly situated with all these factors.  I mean permanency.  Right?  That's another one that hasn't been discussed.  These guys have worked for TSS for years.  James Lauterbach worked for over three years with TSS, he didn't work anywhere else.

If you look at the number of days he worked, that's 1031 day pay period and he's detailed this on the record with his spreadsheet.  There's only about 200 days that he didn't

1        work for Total Screen Solutions out of 1031.  And an employee

2        who worked Monday through Friday would have had 320 days off.

3        So he's working a lot more than even full-time employees, as

4        far as just the number of days that he worked.  That's a

5        permanent relationship.

6                You know, the guys in, you know, the 5th Circuit

7        case, they talk about -- this is real interesting -- you look

8        at the Mr. W Fireworks stand operators, right, there's two

9        things really interesting about that case.  They were

10       employees, they work two short seasons.  They worked a 13-day

11       season for Christmas and New Year's and they worked an 11-day

12       season July 4.  The rest of the year they're not working for

13       Mr. W, have nothing to do with Mr. W.  They're working other

14       jobs.  But because they're employed for that entire season,

15       for that time period, they're permanent in regards to that.

16               Now *Baker v Flint Engineering* is another interesting

17       one about -- out of the 10th Circuit.  In that case you got

18       oilfield workers and because they work from rig up to rig

19       down, they're considered to be permanent because that's the --

20       that's their -- in reality that's the work cycle for these

21       guys.  And that's what we have here.  Welders are on the same

22       sort of analysis.

23               There's a case that just came out against Patterson,

24       motion for summary judgment granted in favor of Plaintiff

25       welders against Patterson UTI in the Eastern District of Texas

on January 30, and in that case there's gaps between the rig times, just like there is here, and they're still permanent employees because they come right back on at the same rate under the -- in the exact same way.  They get assigned through the company that's -- well, they're actually working directly with Patterson, but they -- even though there's gaps, it doesn't take away from that because they come back at the same rate.

And that's what these guys do.  If they get a raise -- you know, most of them pay about 250, if they get a raise, that raise sticks from rig to rig until they get a raise from TSS.  I mean that's a level of control that doesn't have anything to do with the company man.  Company men don't determine their raises or what they're paid, or have anything to do with the equipment because that's all provided and controlled by Total Screen Solutions.

So, you know, this case is like many, many, many other FLSA cases where you have a situation where the workers on assigned off site.  That does not mean that we have to go through analysis of what every single worker had as far as his relationship with the client location and the people there, because we're not challenging that at this time.

We're not going after the company men, we're trying to determine whether or not they're similarly situated and their control and permanency and all the other factors with

one entity, which is Total Screen Solutions.  Now the
Defendant has these declarations from what I call happy
campers.  They're hand-picked from the Defendant, have
admitted they have an interest in continuing with Total Screen
Solutions and getting jobs with them.  And so, you know,
Court's have found in situations like that that the employee's
testimony is unreliable.

These same guys that testified for TSS admit of
basically working a fraud on Total Screen Solutions.  They
say, you know, we would not tell Total Screen Solutions and
one of us would go home while one, you know, and still get
paid like we were still at the rig site without telling them,
and the other one would cover for -- you know, the other
worker would cover.

You know, if you're going to deny conditional
certification, you know, if you were based on that testimony
on guys who are admitting to a fraud on TSS, who also are
saying that they're not working for TSS anymore and that
presumably must be why, in other words there maybe is a policy
that they're not allowed to do that, and that they want to get
work with them again.  So they have an interest in saying
whatever TSS wants them to say.  So, you know, I don't think
that they're -- the testimony of the -- of TSS's witnesses is
persuasive.

And what we need to look at is whether or not these

1    guys are similarly situated with TSS, not with some other

2    company.  You know, they all have different relationships at

3    home or different relationships with any other companies that

4    they may be trying to get employment with after -- or just

5    looking for a better deal.  Right?  And those relationships

6    don't matter.  What matters is the relationship with Total

7    Screen Solutions, is whether or not Total Screen Solutions is

8    providing enough control or not.

9              MS. IDALSKI:  Your Honor, if I could one thing?

10             THE COURT:  Uh-huh.

11             MS. IDALSKI:  The Plaintiff has not provided you

12   with a single case where conditional certification was granted

13   where there were not common supervisors.  This case is not

14   like every other case out there.  This case is different, this

15   case is like *Andel*, like the case that we just talked about

16   with respect to Judge Rainey.  There is not a case out there

17   that has been conditionally certified where there are not

18   common supervisors.

19             MR. MOULTON:  Your Honor, if I may, that's not

20   right.  I mean there --

21             MS. IDALSKI:  Then cite one please.

22             MR. MOULTON:  I can provide many more, I'll give you

23   two right now.  *Prejean v O'Brien's Management Company*.  Also

24   *Lima v International Catastrophe*.  Those are cases that are --

25   they're basically these, you know, catastrophic, you know,

1    events like storms and things like that where people are going

2    out to work.  And if it's not -- if *Lima* -- and there's other

3    ones out of the Eastern District of Louisiana as well where

4    there's -- you know, they talk about a thousand different

5    contractors that these guys all work for, they're manual

6    laborers.

7            And they're conditionally certified because we're

8    looking at the relationship with the company that referred

9    them out.  In *Prejean* -- I'm the main attorney in that case --

10   our guys --

11           THE COURT:  I thought that was cited in here

12   somewhere.

13           MR. MOULTON:  It is.

14           MS. IDALSKI:  It is cited --

15           THE COURT:  Okay.

16           MS. IDALSKI:  -- Your Honor, and actually on page 6

17   of that case it specifically states that the superiors were

18   also hired by the O'Briens.  So you have common management in

19   that case as well.  I went through -- I've gone through every

20   one of his cases and highlighted where there were common

21   supervisors, and I've got them all highlighted here.

22           There's *Prejean*, there's *Putnam* and there's *Prater*

23   and in each one of those cases they all worked under the

24   control and direction of a single person, Dillick (phonetic),

25   that's *Prater*; worked under the direction and control of those

1    hired by the O'Briens, that's *Prejean*.   *Putnam*, the fact that

2    the area managers across different locations may have

3    different management, blah, blah, blah, they all worked --

4    they were all managers -- they all were the same managers that

5    these individuals were reporting to.

6         We've got a major issue here, Your Honor, with this.

7    And Plaintiff is going on and on, but he's not providing the

8    Court with any specifics or with any evidence with respect to

9    this issue.  We're talking about the control factor.  That's a

10   very important factor in this test.  We're not talking about

11   all these other factors.

12        Someone -- there has to be a common policy, plan,

13   they have to be similar in independent contractor cases with

14   respect to how these individuals are controlled.  And if there

15   is no control, then there's not going to be any independent

16   contractors.

17        But at this point in time we don't have a common

18   theme here with respect to that.  I have not seen a case, and

19   I've looked hard for one, where there was not a common --

20   common supervisors, common management, or common control and a

21   case has been conditionally certified.  You know, we don't

22   necessarily -- you know, we need to look at this.  This is

23   something that's important to all of us.

24        We don't want to have to make -- we might as well

25   have separate cases if we're going to have individualized sort

1    of analyses.  And that's what we're going to have to do here.

2    So this is a big problem.

3              MR. MOULTON:  Your Honor, if I may, that's just not

4    right.  I mean there -- and I'm happy -- if the Court needs

5    more cases on this, I will get it.  But it is very common to

6    be -- you know, in these situations where you send out to

7    multiple client locations, you still get conditional

8    certification.

9              THE COURT:  But that's not what she's talking about.

10             MS. IDALSKI:  But there's a common manager or

11   supervisor.

12             MR. MOULTON:  Well, no, but there's not.  I mean,

13   and I believe it is the *Lima* case, and there's a thousand

14   different contractors, and that was the argument, that they're

15   subject to these different contractors, you know, they're

16   working for their policies.  And maybe there is some

17   difference there, but we're not challenging how they different

18   with respect to the clients that they're assigned to.

19             We're challenging whether or not the control that

20   is -- that there is present, or is not, either way with TSS,

21   whether or not it's enough to be an employer under the FLSA,

22   with respect to TSS.  Now if you're on location and the

23   company man is telling you things to do, right, and, you know,

24   some rigs they tell them to, you know, use the backhoe, or

25   not, fine.

1          But the other control factors about pay and about

2     where to work and, you know, the hours that they're going to

3     be working, who you're assigned to, whether or not you can

4     have workers, whether or not you have to do it all by yourself

5     or, you know, do it -- I mean personally the services, or you

6     can hire other people on your staff.

7          Those types of control factors that you're going to

8     see with the company that refers, we can look at that on a

9     class basis, and then the Court can determine at the end when

10    we have all the evidence whether or not they're similarly

11    situated in a control factor with Total Screen Solutions.

12         THE COURT:  All right.  I need to look at some

13    matters that were raised today in a little more detail.  So I

14    suggest -- I'm tied up in a conference pretty much the rest of

15    the week, either maybe getting on either a phone conference or

16    you all can appear for a hearing that follow week, or early

17    the next one, Brandy.  So we can just go ahead and finalize

18    this issue on the conditional certification.

19         (Pause in proceedings.)

20         THE COURT:  Are you all available on April 1 at

21    10:00 a.m.?

22              MS. IDALSKI:  Yes, Your Honor.

23              MR. PIPITONE:  Yes, Your Honor.

24         THE COURT:  Okay.  Shall we reconvene then --

25              MR. MOULTON:  Yes.

1          THE COURT:   -- to finalize the conditional

2     certification issue?

3          MR. MOULTON:  Sure.

4          THE COURT:  All right.  Thank you.

5          MS. IDALSKI:  Thank you, Your Honor.

6          MR. MOULTON:  I'm sorry, Judge, did you say

7     10:00 a.m.?

8          THE COURT:  10:00 a.m.

9          MR. MOULTON:  Yeah.  Okay.  Thank you.

10          THE COURT:  Okay.  And if there's nothing further on

11     this case, then you're excused.

12          MR. PIPITONE:  Thank you, Your Honor.

13          MR. MOULTON:  Thank you, Your Honor.

14          (Proceedings adjourned at 10:09 a.m.)

15                              * * * * *

16          *I certify that the foregoing is a correct transcript*

17     *to the best of my ability from the electronic sound recording*

18     *of the proceedings in the above-entitled matter.*

19          */S./  MARY D. HENRY*

20     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

21     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*D-337*

22     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

23     *JTT INVOICE #52230*

24     *DATE:  MARCH 21, 2014*

25