UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| AARON HANSEN, ET AL., | ) | CASE NO:  2:13-CV-00242 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| TOTAL SCREEN SOLUTIONS, INC., | ) | Thursday, April 3, 2014 |
| ET AL, | ) | |
| | ) | (1:28 p.m. to 2:24 p.m.) |
| Defendants. | ) | |

CIVIL MOTION HEARING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE

Appearances:               See Next Page

Court Recorder:            Arlene Benavidez

Case Manager:              Brandy Cortez

Transcriber:               Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, TX 78480-8668
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                    DAVE J. MOULTON, ESQ.
                               Bruckner, Burch, P.L.L.C.
                               8 Greenway Plaza
                               Suite 1500
                               Houston, TX 77046


Defendants:                    DANIEL DOUGLAS PIPITONE, ESQ.
                               KENNETH WAYNE BULLOCK, II, ESQ.
                               Munsch, Hardt, Kopf, and Harr, P.C.
                               700 Milam
                               Suite 2700
                               Houston, TX 77002

Also present:                  Gary Mills

1    __Corpus Christi, Texas; Thursday, April 3, 2014; 1:28 p.m.__

2                        **(Call to Order)**

3             **THE COURT:**  Court calls Cause Number 2-13-242, *Hansen*

4    *versus Total Screen Solutions, et al.*  Plaintiff will announce

5    for the record.

6             **MR. MOULTON:**  Yes, your Honor.  David Moulton for the

7    plaintiffs.

8             **MR. PIPITONE:**  Your Honor, I'm Dan Pipitone for the

9    defendants, and if I may, your Honor, one of the defendants,

10   Gary Mills, is here, if I can introduce him to the Court.

11            **THE COURT:**  Okay.  Good afternoon.

12            **MR. MILLS:**  Glad to meet you, your Honor.

13            **THE COURT:**  Nice to meet you.  You can have a seat.

14            We've had a hearing on the motion for conditional

15   certification, I guess a little over two weeks ago, and I've

16   received some further briefing, which I -- I did consider.  Is

17   there anything further on that motion from the plaintiffs?

18            **MR. MOULTON:**  On the motion for the conditional

19   certification?  Yes, your Honor.  We'd like to cover a few

20   things --

21            **THE COURT:**  Okay.

22            **MR. MOULTON:**  -- if that's all right.

23            **THE COURT:**  And I don't need a rehash, and a lot of

24   the briefing that was provided was repetitive and cumulative

25   argument, but I did look at everything already, so if you want

1    to make some minor points, that's okay.

2            **MR. MOULTON:**  Sure.  Okay.  So, employee

3    misclassification is a -- is a big problem.  You know, the

4    Texas Tribune had an article about it finding that it's a

5    breeding ground for payroll and tax fraud.  Many -- what

6    happens when people aren't paid their wages properly is that

7    taxes aren't collected either.  More than 54 million lost

8    unemployment tax revenue just in construction industry in

9    Texas.

10           **THE COURT:**  Okay.  That's not relevant, really, to

11   the issue here.

12           **MR. MOULTON:**  Okay.

13           **THE COURT:**  I don't think.

14           **MR. MOULTON:**  Right.  Well, the -- what we wanted to

15   show, your Honor, is that the Government agencies are looking

16   at this problem, including the Department of Labor.  They have

17   the initiative to actually go after the oil and gas industry.

18   There are lots more people working in that industry and a

19   much -- but the percentage of workers who are being classified

20   as employees is going down.  So, they actually have an

21   initiative to actually go and look at those employees and try

22   to -- to remedy the problem.

23           Now, one of the things that's come up, too, is that,

24   basically, what we're looking at with Total Screen Solutions is

25   a potential joint employment situation.  They are basically a

1    staffing company.  They are providing these solids control

2    technicians to the rigs to remove the solid portion out of the

3    drilling fluid.  These workers work on the side of the rig and,

4    you know, the -- the Family Medical Leave Act has this reg.,

5    it's also by the Department of Labor and uses the same standard

6    for employment as the FLSA.  And they found in these situations

7    joint employment will ordinarily be found to exist when a

8    temporary placement agency supplies employees to a second

9    employer.

10          Now, when you get to conditional certification, which

11   is the stage that we're at, courts routinely do not go into the

12   details of the economic realities test to find out, you know --

13   to make a determination either way.  What they're looking at is

14   to see if they're similarly situated.  And in this case we do

15   have them similarly situated.  They're classified the same way

16   without regard to which oil company they're assigned to;

17   they're paid the same way; they have the same job duties.  It's

18   a very lenient standard.

19          At this point discovery is very limited.  We've only

20   had some initial paper discovery.  There is a pending motion to

21   compel to help get that initial set done.  There has only been

22   one deposition.  And what we're asking here is the Court to

23   notify the employees, let them know about this case, give them

24   the chance to join.

25          Now, when you look at joint employment situations,

```
 1   when you go to companies that are actually staffing companies

 2   like the company that was mentioned in that reg., there's

 3   these -- they'll send you these charts and explain how their

 4   business works.  So, usually your staffing companies are called

 5   PEO's, or professional employment organizations, and they have

 6   a deal with an employee and also a deal with a customer, the

 7   worksite employer.  And normally when they're assigned to a

 8   worksite employer the worksite employer provides direction and

 9   control, determines compensation and conducts performance

10   reviews, just (indiscernible) the general situation here.  And

11   the PEO, or the staffing company, handles the administration;

12   payroll and benefits, provides HR services, and assists with

13   employer compliance.  Like we just read in the reg., this

14   situation ordinarily will cause a joint employment situation

15   where the employee is an employee of both the staffing company

16   and the client worksite employer.  So, that's the general

17   situation you have that you will find employment, as an

18   ordinary course of a matter.

19           Now, if we just modify this chart to more like our

20   situation, the sit hands have a relationship with Total Screen

21   Solutions.  They also have a relationship with the oil company

22   because they're working on the oil company site.  But we know

23   from Gray versus Powers, which was cited in our brief, that the

24   Court has to look at each relationship.  These sit hands may be

25   employed by both.  We -- we're not asking the Court to evaluate
```

1    the oil company relationship.  We haven't sued the oil

2    companies; they're not here.  We're not -- whether or not there

3    are some elements there that are -- that relate to sit hands is

4    not part of the analysis of whether sit hands independently --

5    if I can get this pen to work -- are employees of Total Screen

6    Solutions, because that's the issue.  And when we look at the

7    Total Screen Solutions relationship with the employees, we see

8    that Total Screen Solutions, in fact, administers payroll and

9    benefits; they handle all of the payroll.  They process

10   payroll; they issue checks.  There is nothing odd or irregular

11   about this -- about their -- their pay.  They turn in the --

12   they call them invoices.  It's a little bit grayed out at top,

13   but you can see January 31st; these invoices submitted

14   bimonthly.  And they're just simple; they're sent right to

15   bills to do -- Total Screen Solutions with the total amount,

16   and then Total Screen Solutions handles the checks, pays them.

17          Total Screen Solutions does the hiring and firing.

18   The oil company has nothing to do with hiring and firing in

19   this case.  The managers of Total Screen Solutions do that.

20   They all -- the managers of Total Screen Solutions also provide

21   the follow-up and go out and visit, and they also send service

22   techs to visit and -- and handle problems with the -- and

23   complaints with the sit hands.  Total Screen Solutions also

24   assists the oil company with compliance.  They -- they make

25   sure the workers have required certifications and are safety

1    trained.  Total Screen Solutions determines compensation, not

2    the oil company.  I move them over here because they -- the oil

3    company is not doing that in our case.  And Total Screen

4    Solutions also does performance reviews.  Total Screen

5    Solutions fires people; it talks to them when they think

6    they're making mistakes.

7           These are -- these are the things that we're finding

8    out in discovery.  And, so, the employment factors as between a

9    joint employment situation stack up on Total Screen Solutions.

10   Under the reg., just the three green ones would have been

11   enough; but we have more.

12          Now, determines direction and control; that's the

13   issue that seems to be the hottest issue between us.  Total

14   Screens claims that because the sit hands are working on the

15   oil site on a rig that just the oil company is the only company

16   that's providing the direction and control.  But that's not

17   accurate, because there's more to control than just saying we

18   need -- you know, "We need you to move that pile of cuttings,"

19   or, you know, "You can go now because we're not going to be

20   drilling for a little while."  And the elements of control that

21   we see that are -- only come from Total Screen Solutions are

22   the sit hands are hired directly by the Total Screen Solutions

23   managers.  TSS trains its new sit hands; it assigns them to a

24   more experienced hand.  The managers are assigned -- I'm sorry;

25   the managers assign the sit hands to work on particular rigs,

1    assign them as either a day or night hand.  And these rigs

2    operate 6:00 to 6:00.  If you're up -- if you're assigned a day

3    hand, you're working 6:00 a.m. to 6:00 p.m.  If you're assigned

4    a night hand, you're working from 6:00 p.m. to 6:00 a.m.  So,

5    you're automatically told your schedule.

6            TSS does not allow them to work for other companies.

7    That's a very significant control factor.  They're not allowed

8    to refuse rig assignments.  You know, in our original motion

9    Lauterbach testified about how -- the main plaintiff testified

10   about how he was fired for refusing a rig assignment.  The

11   managers, TSS managers, have the power to hire and fire sit

12   hands and regularly exercise that authority.  Their

13   declarations talked about several instances where sit hands

14   were fired.

15           The sit hands maintain that they're required to

16   remain on the site unless given permission to leave.  Now,

17   apparently, sometimes a commission does come from the oil

18   company, like if they're not -- you know, if they are -- if

19   they need something from town or if they're not drilling and

20   you can let them leave, they have -- they have permission from

21   Total Screen Solutions that if that's the case they can go.

22           The managers and the service techs are making regular

23   visits.  It's usually about once or twice a week -- I'm sorry;

24   once every week or two that they get a visit from Total Screen

25   Solutions, and Total Screen Solutions will restock them with

1    all their materials, restock their supplies, and point out

2    things they missed.

3              Total Screen Solutions requires the sit hands to fill

4    out these daily report forms.  And this is a form created by

5    Total Screen Solutions that tells them exactly what they need

6    to report.  And these guys will write on here.  This is from

7    Michael Guthrie, one of the opt-ins, and says he's monitoring

8    equipment, cleaning the screens, washing a track hoe; he --

9    again, monitoring the equipment, washed the screens and pump

10   recovery tank, greased all the centrifuges and pumps, load

11   trucks.  He also details the number of screens that were used,

12   and all these screens, all this equipment, is provided by Total

13   Screen Solutions.

14             He is given -- to bill the exact costs right there,

15   he is given a price list.  Now, here we go.  He was given a

16   price list; Total Screen Solutions price list.  Centrifuges,

17   $400.  Dryer shakers, $200 each day.  Service techs, $600 a

18   day.  Open top tank, $65 a day.  The rig shaker screens, $350 a

19   day.  Vortex dryer shaker screens, 410 each.  The manager's

20   phone number is at the bottom of this, Nick Mills.  He's one of

21   the owners.  These are prices set by Total Screen Solutions.

22   They control the profit, the economic opportunity here, because

23   if a guy is in business for himself providing solids control

24   equipment, he would have his own price list and provide his own

25   stuff.  But that's not the case.  Total Screen Solutions

1    provides everything.

2           Total Screen Solutions also sets the pay rates.  Now,

3    you know, we have conflicting opinions about this.  People ask

4    for raises, and sometimes they get them.  That's just like with

5    TSS.  Now, what's not -- what's -- and, so, whether you call it

6    a negotiation or whether you call it just asking for a raise

7    and getting a raise, I don't think is really significant.  What

8    I think is more significant is that once one of these workers

9    gets a raise, he stays at that rate from rig to rig.  He does

10   not have to renegotiate his price -- his -- his day rate every

11   time he moves.  It stays that way.  And that's because Total

12   Screen Solutions is setting these and approving them.  The oil

13   company doesn't care what they're getting paid.  All they care

14   about is the price that they have to pay Total Screen Solutions

15   for having that guy out there.

16          Total Screen Solutions did not allow the workers to

17   hire people to work in their stead; they did not allow them to

18   even choose their -- their relief work.  They can't hire their

19   own workers and kind of expand out underneath Total Screen

20   Solutions.  They have to provide their work personally.

21          Now, Total Screen Solutions, the -- you know, that

22   price list we showed here, our guys testified to what they

23   believe the cost of these different things are.  And they think

24   that that -- they think it's in the hundreds of thousands of

25   dollars.  And there's -- some of the things that TSS provides

1   aren't on this list, like the track hoes and things like that,

2   which are, you know, big pieces of equipment.  They think it

3   runs about 700 to 750 thousand dollars' worth of equipment, and

4   the sit hands don't really provide anything.  Total Screen

5   Solutions even provides safety equipment for them.  They are

6   like employees in the sense that they have to pay for gas to

7   get out to the site.  They may occasionally buy a wrench, but

8   this is -- there is nothing specialized that they need for

9   their job; it's mostly just be there.

10          Plaintiffs are also not responsible for exercising

11  initiative in a business sense.  I mean, they're not the ones

12  out there getting the clients.  That's what Total Screen

13  Solutions does.  Total Screen Solutions gets the companies to

14  contract with them to provide the sit hands.  The sit hands

15  don't do that.  All they -- sit hands get a call from Total

16  Screen Solutions and they go.  That's what they do.  So, this

17  is similar to *Hopkins versus Cornerstone America*.  Total Screen

18  Solutions controls the -- the meaningful aspects of the

19  business model such that the sit hands cannot -- they're not

20  their own economic entities, they're not separate.

21          Now, the control factors we just talked about; all

22  those control factors don't matter about what oil company

23  you're assigned to, doesn't matter which company man is out

24  there, doesn't matter what he's -- what that company man is

25  telling you or not telling you what to do.  And -- and, again,

1  that's just like *Gray versus Powers* requires the Court, if

2  we're going to go in this analysis, it's going to -- it

3  requires the Court to look at the -- the employment

4  relationship that's alleged, which is the sit hands and Total

5  Screen Solutions.  And, so, what oil company men say apart from

6  that just isn't part of this; it's a distraction.  That's the

7  reason why most of the cases you'll see don't go into a whole

8  lot about what some third party that's not before the Court is

9  telling the workers, is because they're doing their job right,

10  which is to look at the relationship that's alleged, the

11  employment relationship that's alleged.

12          Now, let's see.  One of the things that's -- that I

13  think is really a key thing here, too, is that the sit hands

14  have worked for Total Screen Solutions for years.  You know,

15  Plaintiff Lauterbach was asked in his deposition:

16          "Was there ever a time that you considered working

17          for another company that provided the same

18          type of --"

19          And he interrupts: "No."

20          "-- opportunity that Total Screen Solutions

21          provided?"

22          He says:

23          "I never called another company, never talked to

24          another company, other than Stage Three when we got

25          kicked off 43, asking me to go work for them when

1           they would keep me on 43 running their equipment."

2           But then that never panned out.  So, during the time

3  he worked for Total Screen Solutions, it was not only a long

4  time; it was exclusive.  And that's what the courts are looking

5  at when you -- when you evaluate permanency.  He's also on call

6  all the time.  Once they -- he's asked:

7           "Okay.  Well, once they set his time, how soon would

8           you have to go?"

9           We're talking about how soon he has to go out and be

10 at the rig.  And his answer is:

11          "As soon as the rig was ready for us."

12          "Okay.  Right.  Then, how much lead advance notice?

13          "Did I need?

14          "Yeah.

15          "They could call me that hour, and within two or

16          three hours I'd be on the road heading that way."

17          The sit hands are not responsible for lost or damaged

18 equipment.  There is no loss for downtime.  There is no

19 opportunity for them to shop for lower prices and charge more

20 because they don't provide the materials, the consumables, the

21 equipment.  There is no bidding process for the sit hands.

22 They have constant day rates.  And like we talked about before,

23 prices are already set by Total Screen Solutions.  So is the

24 location.  The location is set by Total Screen Solutions, and

25 that's important because to the extent that you may look at

1    whether or not gasoline is considered a business investment in

2    solids control, which we don't think it is, but to the extent

3    that a court would be looking at that, if Total Screen

4    Solutions sets the place where you're going to work, that

5    will -- that has the biggest effect on the amount that you will

6    have to pay in gas and other costs to get there.  And, you

7    know, these sit hands don't even have to provide lodging.  They

8    have no skin in the game.  The only skin they have is, is to

9    work a day and get paid, which -- which is just like an

10   ordinary employee.

11           This isn't really skilled work.  There are guys that,

12   you know, that have been -- testified that -- well, that have

13   come up in the testimony that used to be pizza delivery guys,

14   and they have no experience in the oilfield, and they show up

15   and they can run these machines.  So, let's look at some

16   deposition testimony.

17           "So, there can be a pretty big difference in the

18           knowledge and the skills and experience between the

19           sit hands, the day hands, and night hands?"

20           That's the question.

21           "There could be, but it didn't take much experience,

22           I mean, to run these machines; it really didn't.  All

23           you had to do was start them and run them.  Of

24           course, Don and them told us how to run them.  I

25           mean, it didn't take much to run them.  All you had

1          to do was start them."

2          Now, how to run them was a whole other game; to do

3    the job didn't take much.  I mean, the hardest thing probably

4    about it for these hands was running the track hoe.  That

5    could -- they could be -- and, then, another question:

6          "They could be a day trader on the stock market if

7          they wanted; they could be a pizza delivery boy, like

8          we had a couple of those."

9          "That were sit hands?  That they were -- that's what

10         they were doing?

11         "Yeah, they were pizza delivery boys beforehand."

12         So, we're not talking -- you know, I think on -- when

13    you're looking at the kind of oilfield workers, welding has not

14    been held to be skilled unless it's pipeline welding, which is,

15    I think, semi-skilled.  Running solids control equipment is --

16    is like welding or less skilled.

17         Now, we can look at the other aspects of this

18    relationship, too; for example, whether or not it's integral.

19    Total Screen Solutions is a screen solutions company.  They

20    provide the screens and they provide the people to get drilling

21    fluid cleaned up.  And that's exactly what the sit hands do.

22    They do Total Screen Solutions' business.  They are integral

23    into that.  They -- Total Screen Solutions also provides

24    advertising, marketing, insurance.  Sit hands provide none of

25    that.  All of these things that we're talking about don't have

1    anything to do with whether a company man tells you to clean

2    that up, do this, go home.  Those are not -- those are, like,

3    day-to-day supervision items, which is expected from a worksite

4    employer, but are not required as part of the analysis between

5    sit hands and Total Screen Solutions, in fact, have nothing to

6    do with it.

7              So, we looked at -- you know, we've pointed out

8    several cases where -- basically, it's going to be a staffing

9    company case is where you're going to see this situation.  And

10   we detailed some of those.  I think *Heeg versus Adams-Harris* --

11   it's a case that our firm did in front of Judge Rosenthal.

12   That one's a interesting case because Heeg -- or Adams-Harris

13   was a staffing company.  And that staffing company assigned

14   these, basically, folks that did sort of accounting bookkeeping

15   work to work at all sorts of clients' locations, in their

16   locations, subject to the control of the people in those

17   locations.  It's not just about that they're in different

18   places; they're actually working the hours and the -- and the

19   job duties that the clients want.  And there's still

20   conditional certification granted there, and part of the reason

21   why is, not only did Judge Rosenthal not really get into the

22   economic realities factors, but she also recognized that what's

23   happening outside of the analysis between whether or not

24   they're employees of this company or not doesn't impact that

25   analysis, because we're not alleging a joint employment

1    relationship.  And even if we were, *Gray versus Power* says we'd

2    still have to look at the individual relationship.  We'd have

3    to look at how sit hands relate to TSS.

4           *Sealey versus Emcare*.  That was a case that your

5    Honor handled.  In that case the opinion for granting

6    conditional certification, as the defendants pointed out,

7    doesn't exactly state -- say why, but when you look at the

8    facts, it's very similar.  We have workers assigned to multiple

9    hospitals, have to follow those hospitals' procedures, those

10   hospitals' hours, subject to those -- those hospitals'

11   direction and control.  And that wasn't part of the analysis

12   about for conditional certification, because the analysis is

13   whether or not the -- the workers were similarly situated with

14   respect to the employer at issue, which is Emcare.

15          *Solis versus Gate Guard*.  I think that's an

16   interesting case.  That case started with the Department of

17   Labor doing an investigation and bringing an action to recover

18   the overtime for all of these gate guards.  The Department of

19   Labor can basically bring, like, a Rule 23.  They get to

20   represent everybody.  They brought it in -- in Corpus.  And

21   about the same time, because there had been a bad ruling for

22   gate guards in Victoria, the Gate Guard company sued for a

23   declaratory action, that they were complying with the FLSA in

24   Victoria, got the case yanked out of Corpus and into Victoria

25   so that all of it was combined.  But it wasn't a case on

1    conditional certification, but what it was, was a class-wide

2    determination on the merits at summary judgment for workers who

3    are, in this aspect, similar, but they're assigned to different

4    oil companies and subject to their rules and their hours.

5    Okay?  And that court made that determination that they were

6    all actually not employees without considering that, because

7    that wasn't the analysis.  The analysis was not what the

8    company men do or don't do; it's about whether or not with

9    respect to Gate Guard were they employees.

10           Now, we've also seen a similar situation come up with

11   the catastrophe cases in the Eastern District of Louisiana, in

12   *Prejean*.  It's the same issue.  The defendants are saying:

13   look, all these oil spill workers are part of this emergency

14   management system and they are -- depending on where they're

15   assigned to, they have to listen to these different companies,

16   whether it's Coast Guard or if it's, you know, Swift or

17   these -- the response group, or these other companies that were

18   also involved in the spill.  And the court didn't go into that.

19   That's not the relationship before the court.  The court looked

20   at what control does exist between Prejean and the class

21   members and O'Brien's, which was the employer at issue, and

22   found that there were some control issue -- control factors

23   that were common.  And that's the reason why you see that in

24   the opinion, that they say they were controlled by O'Brien's.

25   And you could -- the Court can do the same thing here, can look

1   at sit hands are controlled by Total Screen Solutions in the

2   fact -- in the ways that we've talked about.

3         *Lima* is the same sort of situation.  You have all

4   these subcontractors underneath a general contractor, and you

5   have a couple guys underneath one of them who are suing the

6   general contractor.  And the court issues notice because the

7   court found it's likely -- which is the standard of conditional

8   certification -- it's likely that these other ones, even if

9   they're subject to the rules and regulations or contracts of

10  other subcontractors, that they'll be treated similarly.

11  Because at the conditional certification stage we're not

12  talking about a final decision that they're conditional -- that

13  they are similarly situated.  All it is is a preliminary one.

14  That's why it's called conditional.

15        Now, at the end of discovery, when we've had time to

16  flush out all of the facts and do all the depositions, get all

17  the written discovery, then the defendants can, you know, make

18  their motion for decertification.  At that point the court

19  makes a final determination of whether or not they're

20  conditionally certified.  At this point it's just:  Is it

21  they're likely to be similarly situated; it is have they raised

22  enough evidence to show that there is a -- that there is a

23  likelihood here that they could be similarly situated.

24        *Daugherty versus Encana Oil and Gas*.  It's the same

25  kind of thing.  It's a staffing company.  Staffing company --

1   actually, it's an oil company using many, many staffing

2   companies, 40 of them, to provide oilfield pumpers.  Now, there

3   are huge differences among these staffing companies.  Some of

4   them had different pay arrangements, they operated under

5   different contracts, they received different portions the

6   staffing companies charges the oil company, some were

7   classified as employees, some as independent contractors, some

8   may have received overtime, some may have not.  But the court

9   looked at that situation and found that because -- the court

10  was focusing on whether or not the oil company was engaging in

11  a pattern or practice of not paying overtime by using these

12  subcontractors.  And at that early stage, you know, before all

13  of the facts were before the court, the court says, well, yeah,

14  they're -- they're similarly situated because they're not paid

15  overtime and they're doing similar job duties.  And, you know,

16  through discovery we'll find out if there are differences that

17  would merit decertification.

18            The *Mr. W. Fireworks* case.  The *Mr. W. Fireworks* case

19  nobody is saying that that's a strict seasonal test.  In *Mr. W.*

20  *Fireworks*, those fireworks stand operators worked two seasons a

21  year.  Or sometimes they only worked one and never came back.

22  But it was like a 13-day New Year's and Christmas season, and a

23  July 4th season lasts only 11 days.  And if they worked both

24  seasons, they would have been worked -- they would have worked

25  24 days the entire year for Mr. W. and earning their income

1   somewhere else, apparently.  But the fact that, you know,

2   the -- the fireworks -- or Mr. W. tried to say:  There's these

3   super short, you know, time periods that they're working for

4   us, so they're temporary employees.  And the court said no.

5   The Fifth Circuit said, no, they're full-time employees because

6   they're working the season.  We have to look at the

7   operational -- or the intrinsic operational characteristics of

8   the fireworks industry in *Mr. W*.  And that is it's two short

9   seasons, and if you work the season, you're a permanent

10  employee.

11          Now, what *Mr. W*. is telling us is to look at the

12  intrinsic operational characteristics of the oil industry.  And

13  the reality is, is that rigs go to a location, they rig up,

14  they drill until they're done, they rig down until the next

15  job.  And that's what sit hands do.  They get called when it's

16  time to go to a rig, they show up, they can help rig up,

17  they'll be there running all the solids control equipment while

18  they're -- while they're drilling and drilling, until they're

19  done.  And then they go home; because that's what employees in

20  this industry do.

21          Now, *Andel*, I think, failed to account for that.

22  *Andel* said, well, because -- it was only a conditional

23  certification order, but they were denied conditional

24  certification because, I guess, there were some -- the Court's

25  talking about some irregularities or a pattern of days worked

1   and days off and the invoice submissions.  Well, we've looked

2   at invoices in this case; they're not irregular.  They're the

3   15th and the 30th or the 31st.  But the -- there are going to

4   be varying lengths of time between assignments.  That's not

5   anything difficult to do.  Total Screen Solutions knows exactly

6   what days they worked; they have the payroll records that show

7   what days they worked; we can put it into a chart and calculate

8   damages.  That's not a problem.  And the fact that they are

9   working, you know, for the rig for a -- while the -- while the

10  rig is operating and they're off while it's not, well, that's

11  *Mr. W.*  That's the intrinsic operational characteristic we've

12  got to account for.  If they work from rig up to rig down, then

13  they're permanently employed during that time.  They get -- you

14  know, they don't get regular weekends off like normal

15  employees.  They'll have maybe five or six days off between

16  their rig and then they're back on.  And they can be on for 30,

17  40 days.  You know, sometimes only 10 or 15.  It just -- it

18  does just depend.  But, like I say, I don't think that impacts

19  permanence.  And the thing is they keep coming back.  It's not

20  like they worked one job with Total Screen Solutions and

21  never -- never come back again.  They work for the rig, they're

22  off for a few days, they're on call, they get called, and the

23  next couple hours they're back out there again, and nothing's

24  changed.  They didn't have to renegotiate their pay; they

25  didn't have to bid for a project; they don't have to provide

1    anything; they just need to get there.

2           So, on *Baker versus Flint Engineering* out of the

3    Tenth Circuit, they've done it right.  There you have rig

4    rollers --

5           **THE COURT:**  I reviewed everything that was submitted,

6    and a lot of these cases --

7           **MR. MOULTON:**  Okay.

8           **THE COURT:**  -- I've already read and reread

9    throughout the briefing, so --

10          **MR. MOULTON:**  Okay.

11          **THE COURT:**  -- I don't know if you have anything

12   outside of that to -- to respond.

13          **MR. MOULTON:**  Okay.  Well, there is a -- well, I'll

14   just point out that -- that *UTI versus Patterson* -- *Andel* --

15   was the case in Victoria that got -- that was decertified.

16   That's one of the cases the defendants are relying on.  Now,

17   what happened after the decertification was that the plaintiffs

18   went and filed their individual actions because they couldn't

19   be in a, you know, collective action anymore.  And we've seen

20   the first summary judgment decision come out of the Eastern

21   District, and that was cited in our most recent -- it's

22   *Faulkner versus Patterson-UTI* combined with another plaintiff;

23   you know, they're all -- they're original *Andel* guys.  And the

24   motion for summary -- well, the summary judgment then granted

25   in plaintiff's favor, that they were employees, you know,

1    these -- these -- it's similar to the situation here.  You've

2    got welders who are subject to, you know, various rules and

3    regulations, they -- you know, in the oilfield, and -- there is

4    a -- you know, a case that we just noticed a couple days ago;

5    it's also similar; *Randolph versus Powercomm Construction*.

6    This one came out January -- or, I'm sorry -- March 25th, 2014.

7    I don't think Mr. Pipitone has seen it; I'll give him a copy.

8           Well, in that case you have plaintiffs who are -- and

9    if the Court would like a copy --

10       **THE COURT:**  Okay.

11      **(Pause)**

12      **MR. MOULTON:**  Here we have flaggers for a

13   construction company.  And the construction company is

14   saying -- well, actually, it's -- it's a staffing and

15   construction company.  They staff them out to various other

16   construction companies.  And when they go work on other

17   construction company sites, they have to do what the other

18   construction companies say.  The summary judgment granted --

19   let's see.  Well --

20      **(Pause)**

21          So, the -- well, the point of this case is that the

22   defendant is arguing because they're subject to control of the

23   assigned employer that they're -- that the control factor

24   doesn't weigh in their favor.  But that's not the way the court

25   saw it.

1          "Because a reasonable jury could find that plaintiffs

2          were controlled by defendants or by subcontractors to

3          whom defendants had delegated their control, this

4          factor weighs against summary judgment."

5          So, this was a -- actually denial of defendant's

6  summary judgment, I believe.

7          And, so, we're not talking about some mysterious or

8  novel or strange situation.  This is a very common situation

9  where you have workers assigned to work on somebody else's --

10  on somebody else's site.  And when we're looking at conditional

11  certification, we're going to look at whether or not they're

12  similarly situated for the company that's alleged to be the

13  employer, which is in this case Total Screen Solutions.

14          That's all I have, your Honor, for now.

15          **THE COURT:**  Thank you.  Mr. Pipitone?

16          **MR. PIPITONE:**  Thank you, your Honor.  I clerked for

17  a federal district court judge as a law clerk 34 years ago, and

18  out of two things I learned, one is, obviously, that means I'm

19  old; but, two, it also means that when the Court says they

20  pretty much have made up their mind, either you don't say

21  anything at all or you keep your comments very, very brief.  If

22  I could opt for that --

23          **THE COURT:**  Or you might get the Court to change

24  their mind.

25          **MR. PIPITONE:**  On that note, your Honor, then, I

1　really don't have anything else to add, other than, if I may,

2　that in this type of a case with misclassification being the

3　issue, whether somebody is an employee or an independent

4　contractor, you can't look at just the geography.  We're not

5　talking about the geography here.  What we're talking about is

6　whether the Court will apply the economic realities test, the

7　five factors, if it can apply those factors to everybody in the

8　class as though that class was one person.  And here, because

9　control is exerted by the company men, which is unequivocal,

10　that's impossible to do.  And that's the basis of our entire

11　argument.

12　　　　　　With that, your Honor, thank you, and look forward to

13　your decision.

14　　　　　　**THE COURT:**  All right.  Like I said, there was a lot

15　of briefing provided; this is our second hearing on this

16　matter; I've reviewed everything fully, and Court's going to

17　grant plaintiff's motion for conditional certification.  It is

18　a lenient standard at this stage.  Court finds the putative

19　class members are similarly situated for purposes of this

20　preliminary or conditional certification phase.

21　　　　　　So, I would like for you all to confer about the

22　order and the notice.  I don't -- I have problems with the one

23　proposed by the plaintiffs.  You all can do that now; Brandy

24　can e-mail you other ones I have approved in other cases that

25　you all can work off to know what I am likely to approve and

1    not approve, or she probably has copies for you if you want to

2    look at that now.  But before you do that -- and you're welcome

3    to do that today and so we can work through it, or do that on

4    your own time.  But there is a motion to compel discovery

5    pending by the plaintiffs.  Have you all conferred on that?

6            **MR. MOULTON:**  We had a conversation on the phone

7    about it before we filed, and we've also written letters back

8    and forth.

9            **THE COURT:**  Okay.  But a conversation is not --

10           **MR. MOULTON:**  Well, let me -- let me further -- your

11   Honor, we've conferred on it at length, actually, because we've

12   had several phone -- well, we've talked about it on the phone

13   several times, and then we filed a meet and -- we sent them a

14   meet-and-confer letter, and then we had a conference call with,

15   I think, three of defendant's attorneys and went over the

16   issues.  And we weren't able to agree, and that's when we filed

17   our motion.

18           **THE COURT:**  So, everything that's set out -- it's a

19   pretty lengthy motion -- has been addressed and not agreed to.

20           **MR. MOULTON:**  Yes, your Honor.  Now, there is a --

21   some of the things that we have agreed to we haven't completed

22   yet, but we're -- we're working on that.  But if we need to

23   bring those issues up, we will.

24           Now, the reason why the motion --

25           **THE COURT:**  Well, it's pending; it wasn't ripe.  I

```
 1   have not -- I didn't ask for a shortened time frame on that,

 2   but I just wanted to see what we need to do to address that.

 3   Do we need to set that for a conference after defense has had a

 4   chance maybe to respond, or how do we get that moving?

 5              MR. PIPITONE:  Your Honor, a lot of the matters were

 6   addressed in our conference call, and many were agreed to; some

 7   were not.  We could perhaps try to confer one more time to see

 8   if we can narrow that down for the Court --

 9              THE COURT:  Uh-huh.

10              MR. PIPITONE:  -- so the Court's burdened as little

11   as possible (indiscernible).

12              THE COURT:  Okay.  That would -- that would be good.

13   And, then, if there are any issues remaining, let Brandy know

14   so she -- we can get on the phone or whatever we need to do --

15              MR. PIPITONE:  There --

16              THE COURT:  -- to address those issues, but then

17   streamline it for me to let me know -- imagine the defense will

18   be filing a response or a joint submission to the Court

19   regarding what the Court needs to focus on.

20              MR. PIPITONE:  Your Honor, there is a motion pending

21   for a summary judgment with respect to the defendant, Gary

22   Mills.

23              THE COURT:  I've reviewed that.  I think it's

24   premature at this point.  So, I was going to discuss that

25   today.  I was going to deny it without prejudice, so, you know,
```

1    you all could certainly refile it.  I just think with what's

2    before the Court at this point there were fact issues.

3              MR. PIPITONE:  Your Honor, I wonder if I may request,

4    instead of denying it without prejudice, if you could simply

5    hold it in abeyance until a sufficient opportunity for

6    discovery --

7              THE COURT:  I don't mind doing that, but you, as a

8    federal -- former federal law clerk, would know that the

9    motions -- as long as it's not sitting there for six months,

10   I'm probably okay --

11             MR. PIPITONE:  I recall filling out those reports for

12   the judge, so --

13             THE COURT:  So, I will leave it open, but if it gets

14   a little further I may nudge you all to say, you know, we're

15   going to terminate this and reconsider it later.

16             MR. PIPITONE:  Well, or on the other hand, have the

17   plaintiff go ahead and proceed with whatever discovery they

18   need with respect to Gary Mills and get this over with.

19             MR. MOULTON:  Your Honor, that's --

20             THE COURT:  That's fine.  I mean --

21             MR. MOULTON:  -- that's exactly what we intend to do.

22   We --

23             THE COURT:  Okay.  So, I will for purposes of now,

24   then, just leave it open.  I won't make a ruling on it and just

25   think it's a little premature right now.  You all do further

1    discovery; the motion will remain pending.  You all are going

2    to have to let me know, though, when I need to, when it's ready

3    to go or you all are going to file additional pleadings

4    regarding that motion.

5             **MR. PIPITONE:**  Your Honor, with respect to the notice

6    issue, to me, that is -- if there is going to be a conditional

7    class certification, the notice is incredibly important to me.

8             **THE COURT:**  I -- well, I agree, and I don't like the

9    style of this.  It seems a little like an advertisement instead

10   of something authorized by a federal court.

11            **MR. MOULTON:**  Your Honor, it's just a form that we've

12   used in lots of cases, but I'm not married to that form.

13            **THE COURT:**  Yeah.

14            **MR. MOULTON:**  I mean, it's -- we can use the form you

15   like.

16            **THE COURT:**  I've had Brandy make some copies of prior

17   orders and notices and consent forms that I've approved, so I

18   don't know if you all want some time to look at that and try to

19   submit an agreement to the Court, or just where we have maybe

20   just a couple issues from -- for the Court to consider.

21            **MR. PIPITONE:**  Your Honor, if this is amenable to the

22   Court, perhaps just a brief discussion about a couple of

23   things?

24            **THE COURT:**  That's fine.

25            **MR. PIPITONE:**  One, because this is coming out with

1    the imprimatur of the federal court, it should not look like an

2    advertisement, which is precisely what this looks like:  Please

3    sign your case up to me.

4              **THE COURT:**  And I've addressed that, so --

5              **MR. PIPITONE:**  Yeah.  So --

6              **THE COURT:**  I think what you have before you, if you

7    got a copy from Brandy, will show you what I'm inclined to do

8    and look at.

9              **MR. PIPITONE:**  Okay.

10             **THE COURT:**  But also I think there was an issue when

11   I was reading the briefs regarding the notice about attorneys.

12   I'm not -- and I have addressed this in another case --

13   inclined to -- I think any potential opt-ins need to be

14   informed they can retain their own attorneys.  I'm not going to

15   bar people from opting in just because they have a different

16   lawyer.  I mean, all of this is about efficiency on the Court's

17   part, too, and I don't see where that needs to be somewhere

18   else, or filed as a different case.  Whether they remain in or

19   not later, I just kind of -- I noticed it was all directed -- I

20   didn't see anything -- and it's been a little while since I

21   reviewed what plaintiff proposed in detail -- but about them

22   being able to contact someone else if they desired to do so.

23   That being said, I don't have a problem with listing the main

24   counsel for plaintiffs for questions.  And you'll see that in

25   some of the others I have.  I don't tend to include the defense

1    counsel in there.

2             **MR. MOULTON:**  Right; I see this one that -- the

3    example, I think this is fine:  If you have any questions, you

4    know, you may contact them directly or you may contact any

5    counsel of your choice.  That's -- that's fine.

6             **THE COURT:**  Okay.  Just --

7             **MR. MOULTON:**  Well, I just -- well, I didn't -- I

8    thought that the -- yeah.  No, my actual issue was something

9    else.  So, that -- that's -- I don't have a problem with that.

10            **THE COURT:**  Okay.

11            **MR. MOULTON:**  What I -- the main thing that I also

12   can remember -- it's been a while for me, too, to remember --

13   is on the consent form they need to be able to put their

14   contact information.  Because these are people that can get --

15            **THE COURT:**  That's fine.  But what are you --

16            **MR. MOULTON:**  -- they can be subject to discovery.

17            **THE COURT:**  What are you asking for?

18            **MR. MOULTON:**  Well, they need to be able to give us

19   their name, address, phone number, e-mail address.

20            **THE COURT:**  I usually allow e-mail addresses.

21            What else?  I thought there may have been a couple of

22   other issues on --

23            **MR. PIPITONE:**  There were, your Honor.  If I

24   understood correctly, you said that you would not allow the

25   defense counsel to be on the notice in case --

1          **THE COURT:**  I have not allowed that in the past.  I

2    mean, you can certainly, you know, bring that up; we can

3    address it.

4          **MR. PIPITONE:**  I would like to, because --

5          **THE COURT:**  Okay.

6          **MR. PIPITONE:**  -- your Honor, when anyone tries to

7    make an intelligent decision, then it's always best to have

8    both sides of the case.  And, so, if somebody is given just one

9    side of the case, it's impossible for them to make that

10   informed decision.  Now, I would like the opportunity to give

11   the defense, just as Mr. Moulton definitely wants to have that

12   opportunity to give the reasons why they should pursue an

13   action and recovery.  So, I would like people -- they don't

14   have to, but we can put it in the notice -- they don't have to

15   call either one of us.  But both names and all the contact

16   information should be provided with the instruction that they

17   can choose to call one or both or none at all.

18          **MR. MOULTON:**  Your Honor, we -- courts have looked at

19   this, and most courts don't do it because the -- the defense is

20   duty bound, has a total different interest in this case.  The

21   lawyers for the defendant are doing -- their job is to make

22   sure they never get paid.

23          **THE COURT:**  Have you been involved in cases where

24   that's been allowed, Mr. Pipitone?  Because I've just not seen

25   it in what I've -- I've done in the last few years.

1      **MR. PIPITONE:**  I would say, your Honor, I'm no more

2  biased in favor of my client than Mr. Moulton is in favor of

3  his.  I mean, that's a ridiculous assertion.  So, if -- that's

4  one thing I would very much like to have the opportunity to do.

5          **THE COURT:**  Have other courts allowed that?

6          **MR. PIPITONE:**  I have not requested that of other

7  courts, your Honor.

8          **THE COURT:**  Yeah.  I'll give you some time to look

9  into that.

10         **MR. PIPITONE:**  Okay.

11         **THE COURT:**  I have not seen that in the matters I've

12 had before the Court regarding the FLSA, so I have never been

13 inclined to include that.

14         **MR. PIPITONE:**  All right.

15         **THE COURT:**  But if you want to look into that and let

16 me know further, that's fine.

17         What other issue on the notice from the plaintiffs?

18 Anything?

19         **MR. MOULTON:**  Your Honor, it --

20         **THE COURT:**  And there may be --

21         **MR. MOULTON:**  I know Andrew --

22         **THE COURT:**  -- there may be issues that come up when

23 you all --

24         **MR. MOULTON:**  Right.

25         **THE COURT:**  -- go through that and try to submit

1    something to the Court, but just generally, if there is

2    something I can jump on.

3         **MR. MOULTON:**  I'm sure this notice is fine.  I know

4    Andrew Dunlap very well.  We do cases together, and if -- if

5    this is something you've approved in one of his cases, I'm sure

6    it's fine.  If we follow this format, I'm sure it's going to

7    work out.

8         **THE COURT:**  Which one are you looking at, in

9    particular?  Because there were several.

10        **MR. MOULTON:**  I'm looking at this *Durbin versus*

11   *Advanced Pipeline*.  Is there two?

12        **THE COURT:**  Then, Mr. -- well, there are several, I

13   believe, that we have conditionally certified, and I probably

14   gave you -- two or three of them, Brandy?

15        **THE CLERK:**  There's three cases --

16        **THE COURT:**  Three cases?

17        **THE CLERK:**  -- Durbin --

18        **THE COURT:**  If you all want to review those --

19        **MR. MOULTON:**  Okay.  Here you go.

20        **THE CLERK:**  -- (indiscernible) Martinez.

21        **THE COURT:**  -- and then visit; maybe Mr. Pipitone can

22   review what the Court has sent out in the past.  You all try to

23   submit something to the Court by agreement, and then let me

24   know what's not agreed to, and I can flesh that out further.

25        **MR. PIPITONE:**  And, your Honor, just so I don't chase

37

1    something that is not ever going to pass muster, in addition to

2    having the plaintiff's version of the case, will the

3    defendant --

4             THE COURT:  Yes.

5             MR. PIPITONE:  -- be permitted -- very good.

6             THE COURT:  And all of those have a little -- should

7    include what the defendant's position is.

8             MR. PIPITONE:  Okay.  One thing that we have done in

9    the past is the putative members may -- may or may not want

10   someone like James Lauterbach to be their class rep.  So, we

11   have asked that it be told to these putative class members that

12   Mr. Lauterbach will be proceeding on their behalves.

13            THE COURT:  I don't remember how we have raised -- I

14   know we generally include the named plaintiffs in that notice,

15   but I don't -- anything from the plaintiff on that?

16            MR. MOULTON:  Well, I mean --

17            THE COURT:  Because it -- I mean, they --

18            MR. MOULTON:  Is --

19            THE COURT:  Those named plaintiffs are proceeding on

20   behalf of the others.

21            MR. MOULTON:  Right.  He -- I mean, I agree that

22   certainly through discovery he's going to represent them, but I

23   don't think even the defendants would agree that we can only

24   put James Lauterbach on trial and decide for everybody --

25   usually what happens, you decide on some subset of the class

38

```
 1    that's representative --

 2              THE COURT:  Right, but he is proceeding on behalf of

 3    the class.

 4              MR. MOULTON:  He is.

 5              THE COURT:  So, I --

 6              MR. MOULTON:  Certainly.

 7              THE COURT:  -- I don't think that would be

 8    inappropriate to set that out.

 9              MR. MOULTON:  Right.  I just -- my only thought was

10    that I don't -- I don't think he's saying -- because what I

11    also heard was:  Are we going to have a trial with just James

12    Lauterbach?

13              THE COURT:  No.

14              MR. MOULTON:  He's going to represent --

15              THE COURT:  No, no.

16              MR. MOULTON:  No, no.  Right.

17              THE COURT:  He's not saying that.

18              MR. MOULTON:  Right, right.  Right.  So -- and, so,

19    the plaintiffs need to know that, too, that James Lauterbach

20    will be -- is a class representative for them, but their input

21    and their situation is going to be taken into account.

22              THE COURT:  Well, review what I've done, and I

23    recall -- I thought at least one of those has something about

24    the named plaintiffs representing the class.  But if you want

25    more, less -- I  mean, just seen what you can agree to, and if
```

39

1  you can't, I will --

2          **MR. MOULTON:**  Sure.

3          **THE COURT:**  -- address it.

4          Any other --

5          **MR. MOULTON:**  Your Honor, there is something coming

6  up that we need to work on.  I think -- I don't have my case

7  calendar in front of me right now, but I think April 15th is

8  our deadline to give a settlement demand.

9          **THE COURT:**  You know, I'm afraid because this has

10 been delayed somewhat --

11         **MR. MOULTON:**  We need to --

12         **THE COURT:**  -- that we're going to need to address

13 the scheduling order --

14         **MR. MOULTON:**  Right.

15         **THE COURT:**  -- post, now, conditional certification.

16         Mr. Pipitone?

17         **MR. MOULTON:**  Why don't we -- oh, I'm sorry.  I was

18 going to say maybe we should confer and maybe we'd probably

19 come together with an agreed scheduling order for a -- and

20 propose it to the Court.

21         **MR. PIPITONE:**  I'm sure we can work that out, your

22 Honor.

23         **THE COURT:**  That is fine.

24         **MR. PIPITONE:**  Yeah.

25         **MR. MOULTON:**  Well, it --

1          **MR. PIPITONE:**  Using a lot of the deadlines you have,

2    only use them from this day forward.

3          **THE COURT:**  Uh-huh.  That's fine.

4          **MR. MOULTON:**  Yeah.

5          **THE COURT:**  Okay.  So --

6          **MR. MOULTON:**  I was most concerned about that

7    April -- I mean, that's coming right up, but we can move that,

8    right?  So --

9          **THE COURT:**  Right.  So, you all are going to confer.

10   I don't know if you want to do that right now, if you want some

11   time to look at that in a little more detail, and then maybe

12   within a week have something submitted to the Court or let the

13   Court know that we need to gather again so the Court can

14   address any issues on the order and the notice and, I guess,

15   the form, the consent form.

16         **MR. MOULTON:**  Right.

17         **THE COURT:**  Because you all will know better as to

18   how much time the defense needs to provide certain things, so

19   if you can draft that order also, which I believe there's

20   copies in here of previous orders I've done --

21         **MR. MOULTON:**  Right.

22         **THE COURT:**  -- you all will know where it needs to be

23   posted better than I do, and that's why I kind of throw it back

24   on your hands, in your hands.  So --

25         **MR. MOULTON:**  Okay.

1          **MR. PIPITONE:**  Very good.

2          **THE COURT:**  Okay.  If nothing else, you're excused.

3          **MR. PIPITONE:**  One last question.

4          **THE COURT:**  Okay.

5          **MR. PIPITONE:**  Has your Honor ever used a third-party

6    administrator to do the notices?

7          **THE COURT:**  No, I never have.

8          **MR. PIPITONE:**  Would it be something you'd consider

9    if I can show you some authority?

10         **THE COURT:**  You can submit anything at this point

11   regarding the notice that you all don't agree on and, you know,

12   I'll look at it.  I just -- I don't know that I've even been

13   asked in the past --

14         **MR. PIPITONE:**  Uh-huh.

15         **THE COURT:**  -- with the ones I have certified.

16         **MR. MOULTON:**  Your Honor --

17         **MR. PIPITONE:**  One major problem with all of this in

18   any of these notices that go out is just the fact that it bears

19   the Court's seal, so to speak, and has the people contacting

20   just the plaintiffs' lawyers and sending the plaintiffs'

21   lawyers everything, almost sounds like that they've been given

22   the good stamp of housekeeping approval to the plaintiffs'

23   lawyers, to the neglect of the defense lawyers.

24         **THE COURT:**  I know.  And that's -- you know, I came

25   on the bench about two and a half years ago, and that's just

1   what has normally been done by the Courts.  I'm not saying it's

2   right or not; it's just kind of that's where the cases are,

3   and, so, I've just kind of gone along with whatever has been

4   approved or what the cases say is okay.  I don't -- what's the

5   plaintiffs' position on that?

6          MR. MOULTON:  Your Honor, well, the -- I mean, all of

7   the notices that I do always have a section in there -- and I'm

8   sure these probably do, too; I haven't read them in full --

9   that make it explicitly clear that you're not saying either

10  way.

11         THE COURT:  I have authorized the notice, but I'm

12  certainly not --

13         MR. MOULTON:  Right.  Plaintiffs are given -- you

14  know, they get to say what the case is about; defense gets to

15  say what the case is about.  Now, the -- the third-party

16  administrator you'll see in huge cases where there's going to

17  be thousands of people and not one firm can really handle the

18  intake, right?  That's not this case.

19         THE COURT:  No, I understand --

20         MR. MOULTON:  Yeah.  But --

21         THE COURT:  -- the concern from the defense

22  perspective.

23         MR. MOULTON:  Right.

24         THE COURT:  However, I think --

25         MR. MOULTON:  Well, what I was going to say --

1          **THE COURT:**  -- normally we've worked this way and it

2    generally has not been a problem.

3          **MR. MOULTON:**  Right.

4          **MR. PIPITONE:**  Well --

5          **MR. MOULTON:**  And the thing that's real important for

6    people, if they're going to join a lawsuit, they often have a

7    lot of questions; they need advice.

8          **THE COURT:**  I know, but that's the issue he has --

9          **MR. MOULTON:**  Right.  Well --

10         **THE COURT:**  -- is they're going to be getting that

11   from you.

12         **MR. MOULTON:**  Right.  Well, they're going to --

13         **THE COURT:**  Without the other side.

14         **MR. MOULTON:**  You know, I have people call me all the

15   time, you know -- I speak Spanish, so I get all the Hispanic

16   clients, and they'll call me up and they'll say:  How -- how --

17   if I join this lawsuit, how is it going to affect my

18   immigration stuff?  You know, how is it going to affect my

19   probation?  Or, I need to go to so-and-so.  Right?  And, you

20   know, we're not going to have a lot of -- maybe not necessarily

21   that, the immigration issues or those kind of issues, but

22   you're going to be -- you know, how does this affect my divorce

23   proceedings, or how does this -- how does this affect my

24   ability to get employment later?  People have -- or how does it

25   affect other legal issues they have.  And, so, if they are

 1  only -- if they could only talk to a third-party administrator,

 2  who can't answer those questions for them, that's -- that's not

 3  right; that's not helping them.

 4          **MR. PIPITONE:**  And, your Honor, too, I will say this.

 5  If it doesn't go to a third-party administrator, if both of us

 6  are put down, I will just say this to the Court.  I have never

 7  in my entire career won a hearing or a trial when I didn't show

 8  up.  And, so -- in fact, I can say I lost every one of them.

 9  And, so, that's what we have here.  If we can't have both of us

10  commenting and let somebody decide, then it's just a one-sided

11  proposition.

12          **THE COURT:**  Yeah, the only -- the problem, I think,

13  sometimes with the defense, I would think, and why I generally

14  don't see or I have never seen where they have been submitted,

15  is because the FLSA is so particular about being careful with

16  the defendant, and the defense attorney who's representing the

17  defendant, there being any sort of -- and I think there are

18  some notices or some examples about no retaliation or

19  blackballing or anything like that by the defense, and I would

20  hate to open up that can of worms; "Well, we called the defense

21  lawyer" -- not that you would do that; I'm just saying people

22  could make some claims -- "and he told me, you know, I'd better

23  not participate."  Not that you would do that; it's just there

24  are some restrictions on some -- I think a couple of those

25  examples have, you know:  You're informed the defendants can't

```
 1   retaliate, blackball, whatever it is, against you if you do

 2   this.  And, you know, I could maybe see some problems, not that

 3   you would do anything, but where plaintiffs would later say,

 4   "Well, I wanted to join, but the defendant's lawyer told me X,

 5   Y, and Z," and -- I don't know.

 6         MR. PIPITONE:  How about if I research it and give

 7   you some cases, your Honor, and --

 8         THE COURT:  You certainly can.  I mean, you all are

 9   going to go off, try to figure it out, what you can agree to,

10   and what you don't I'll be glad to look at.  Right,

11   Mr. Moulton?

12         MR. PIPITONE:  And my whole thought process, your

13   Honor, is just as the Court just indicated a defendant could --

14   and I know that's just generically --

15         THE COURT:  Uh-huh.

16         MR. PIPITONE:  -- could influence, harass,

17   threaten --

18         THE COURT:  Or allegations that there has been

19   that --

20         MR. PIPITONE:  Right.

21         THE COURT:  -- which would then open up a whole

22   another side issue for the Court.

23         MR. PIPITONE:  But just -- just as that could be with

24   the defendant, it could also be to the plaintiffs' lawyer; is

25   he guilty of solicitation?
```

1          **THE COURT:**  Right, but I'm just concerned about, you

2    know, with the FLSA, kind of lays out some things that

3    defendants have to be concerned --

4          **MR. PIPITONE:**  Uh-huh.

5          **THE COURT:**  -- you know, be careful about.

6          **MR. PIPITONE:**  Yeah.  I understand.

7          **THE COURT:**  Okay.  So, about a week to see what you

8    all can get done?

9          **MR. PIPITONE:**  Very good, Judge.  Thank you.

10          **MR. MOULTON:**  Thanks.

11          **THE COURT:**  All right.  Thank you.  And you all are

12    going to also gather on the discovery issue.

13          **MR. PIPITONE:**  Yes.

14          **MR. MOULTON:**  Certainly.

15          **THE COURT:**  All right.  You can be excused.

16          **MR. MOULTON:**  Thank you.

17      **(Proceeding was adjourned at 2:24 p.m.)**

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    April 14, 2014


                    TONI HUDSON, TRANSCRIBER